LIME COLA COMPANY, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 36249–36253. Filed June 17, 1954.

---

[1] The following proceedings are consolidated herewith:

| Name | Docket No. |
| --- | --- |
| Martha Donovan Owens, Alleged Transferee of the Assets of Lime Cola Company | 36250 |
| Donovan Owens, Alleged Transferee of the Assets of Lime Cola Company | 36251 |
| Martha Mabon, Alleged Transferee of the Assets of Lime Cola Company | 36252 |
| Ellen P. Owens, Alleged Transferee of the Assets of Lime Cola Company | 36253 |

*H. Cecil Kilpatrick, Esq.*, for the petitioners.
*Homer F. Benson, Esq.*, for the respondent.

600

OPINION.

BLACK, *Judge:* 1. Respondent asserts that $3,018.75 received in 1941 by transferor, Lime Cola Company, from its sales agent, Lime Cola Sales Company, Inc. (Sales), and against which units of concentrate were shipped by transferor to Sales in 1942 should be added to transferor's income as reported for 1942. The transferees contend that the transferor has already included that sum in its 1942 sales figures and reported it as income. The question presented is purely one of fact. A certified public accountant with over 17 years' experience testified that he audited transferor's books for 1942 and that the $3,018.75 was included in the sales figure contained therein and in transferor's return for that year. Respondent introduced no contradictory evidence. We are convinced of the accuracy of the accountant's audit and have found, in accordance therewith, that the

disputed sum was in fact reported as income by transferor in 1942. On this issue petitioners are sustained.

2. In 1930, transferor purchased flavoring in the amount of $1,294.65 for use in manufacturing its concentrates. It credited this sum to an account payable and, we have found, deducted it as an expense in determining and reporting its income for 1930. In regard to that finding, petitioners assert that the record contains no evidence that such a deduction was made in 1930. However, it is that very circumstance that compels the finding since the petitioners here bear the burden of proving the deduction was *not* taken, Internal Revenue Code, section 1119 (a),[2] and in this they have failed since the record is silent on the matter. Moreover, accepted accrual accounting practice requires that there always be a balancing entry and, in the absence of any pertinent evidence, the natural assumption is that such practice was followed and that the normal balancing entry for an account payable item such as this—i. e., debit to an expense account—was made. That transferor's books and records are unavailable for 1930 does not alter the consequences of petitioners' failure of proof. *Burnet* v. *Houston*, 283 U. S. 223.

The purchased flavoring proved to be of inferior quality, adversely affected transferor's product, and, petitioners contend, caused substantial harm to transferor's business. As a result, transferor never paid the $1,294.65 account and, in 1942, wrote it off crediting the sum to surplus. Transferor did not, however, report the $1,294.65 as income either for 1942 or any other year.

Respondent contends that the $1,294.65 constitutes income reportable in 1942. We think he is correct in this contention. In general, "when recovery [of a previously deducted item] or some other event which is inconsistent with what has been done in the past occurs, adjustment must be made in reporting income for the year in which the change occurs." *Estate of William H. Block*, 39 B. T. A. 338, 341, affd. (C. A. 7) 111 F. 2d 60, certiorari denied 311 U. S. 658. It is not necessary that the previously deducted item actually be paid by an accrual basis taxpayer; it is sufficient if it was properly accrued and deducted in one year and adjusted (before payment) in a subsequent year. *Elsie S. Eckstein*, 41 B. T. A. 746. Again this Court in *North American Coal Corporation*, 32 B. T. A. 535, 542, affd. (C. A. 6) 97 F. 2d 325, stated that " 'when a reserve or liability account, properly created in an earlier year, has ceased to be a true liability or reserve in a later year, it should be reversed and the amount thereof should be added to the income of the year when

[2] SEC. 1119. PROVISIONS OF SPECIAL APPLICATION TO TRANSFEREES.

(a) BURDEN OF PROOF.—In procedings before the Board the burden of proof shall be upon the Commissioner to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax.

reversed.'" That case, as does the instant one, involved accrued liabilities deducted from income in one year which were never paid and, consequently, were transferred to surplus in a later year. See also *Chicago, Rock Island & Pacific Ry. Co.*, 13 B. T. A. 988, 1022, affirmed on this point (C. A. 7) 47 F. 2d 990, certiorari denied 284 U. S. 618; *Charleston & Western Carolina Ry. Co.*, 17 B. T. A. 569, affd. (C. A., D. C. Cir.) 50 F. 2d 342.

Petitioners' only argument on this issue is that the $1,294.65 cannot be treated as income in 1942 on the basis of a book entry alone. With this we are in agreement. The foregoing discussion, however, indicates that more is involved than mere book entries. An actual accrued and deducted liability was, as a result of lapse of time and transferor's actions, reversed in 1942 and in that year became income available for transferor's unfettered use.

We might also point out that there are no facts in the record from which it could possibly be inferred that the extinction of the $1,294.65 account payable constituted either a nontaxable gift to transferor from the creditor, see *Helvering* v. *American Dental Co.*, 318 U. S. 322; *Commissioner* v. *Jacobson*, 336 U. S. 28; or a nontaxable reduction in the purchase price of the flavoring, see *Hirsch* v. *Commissioner*, (C. A. 7) 115 F. 2d 656. Indeed there is no evidence that any negotiations whatever were conducted between transferor and creditor or that the creditor actually canceled the account or followed any particular course of conduct regarding it other than one of passivity. Nor can we infer, from the fact alone that transferor's reason for failing to pay the account was because of the inferiority of the flavoring and the consequent harm to its business, that this nonpayment represented a setoff in regard to a claim for damages against the creditor, or that the creditor and transferor agreed to such a settlement. In fact, the logical inference to be drawn is that no settlement was reached since the transferor scrupulously carried the account as a liability until 1942, and there is no evidence of any settlement in that year.

3. Whether or not the respondent erred in disallowing all but $600 per year for 1942 through 1945 as reasonable compensation for services rendered transferor by Martha Owens is a question of fact, the burden of proving which rests upon petitioners. We have found from the evidence that $1,200 per annum is a reasonable salary for the personal services actually rendered to the transferor by Martha Owens, the corporation's president.

The salient points to be considered are that Martha Owens, although she was transferor's president, was over 70 years old during the years in question, had no office space in transferor's place of business (visiting it only on rare occasions), and rendered no great amount of serv-

ice to transferor. Transferor's operation was small in size, occupying a 5-room suite and employing no more than four people (in addition to the officers) at its peak. It was completely managed, until his death in July 1945, by John S. Owens, Jr., who held all the corporate offices other than president, was fully capable of (and did) handle all of its affairs, and made all the business decisions. He received $12,000 a year for his services. It is true that John often discussed business problems at dinner and during the evenings with Martha and his family, but such discussions were primarily to keep them informed rather than to obtain their advice on business matters. The talks were akin to those a man would normally have with his family concerning his business affairs. Following John's death the active management of transferor's business was taken over by Donovan Owens until transferor's dissolution in December 1945.

Over a period of years Martha Owens loaned transferor sums aggregating between $7,000 and $8,000. It does not appear that she was paid interest on the loans and about $3,000 of the aggregate principal remained unpaid at the time of transferor's dissolution. However, such financial aid is not a proper factor to consider in determining what is reasonable compensation for personal services rendered within the meaning of section 23 (a) (1) (A) of the Code.

We think that $100 a month or $1,200 per year for each of the taxable years in question is reasonable and we have so found in our Findings of Fact.

4. We must next consider whether the September 27, 1945, contract between transferor and Associates, under which Associates promised to pay $40,000 by January 15, 1946, resulted in accrual of the $40,000 as income to transferor for 1945. Portions of the contract are quoted in our Findings of Fact. For convenience, two of the key paragraphs are here reproduced:

THAT FOR AND IN CONSIDERATION OF THE PREMISES and for and in consideration of the sum of Fifty Thousand and no/100 ($50,000.00) Dollars, in cash, payable as set out below, and the covenants and guarantee of the agent [Associates] to the Company [transferor], of minimum sales and deliveries of a minimum number of units of Lime Cola concentrate per year, as hereinafter set forth, and the further consideration of the promises and obligations of each of the parties hereto to the other contained hereinafter, it is understood and agreed between the parties hereto, as follows:

1. The Agent, prior to the execution of this agreement has paid to the Company the sum of Ten Thousand and no/100 ($10,000.00) Dollars, in cash, the receipt of which the Company hereby acknowledges, and covenants and agrees to pay to the Company on or before January 15, 1946, the further sum of Forty Thousand and no/100 ($40,000.00) Dollars, cash, on account of the aforementioned considerations, said sum of Fifty Thousand and no/100 ($50,000.00) Dollars representing a payment of Two and no/100 ($2.00) Dollars per unit of concentrate for twenty-five thousand (25,000) units of concentrate, the guaranteed minimum to be taken during the period of ten (10) years from the date hereof,

as specifically enumerated below; and the Agent agrees to pay or cause to be paid to the Company, the sales price of Sixty-five and no/100 ($65.00) Dollars per unit for each unit sold and delivered pursuant to this contract, the Agent guaranteeing the following minimum number of units per year during each year of this contract:

A reading of the above paragraphs convinces us that the $10,000 paid and $40,000 to be paid were intended as advance payments, or deposits, for units of concentrate to be purchased by Associates. The $10,000 actually paid to transferor in 1945 is not here in controversy. Transferor accrued that as income in 1945 and included it in its return. The transferor did not accrue the $40,000 which was not received in 1945 or at any other time.

It might be contended that there is an ambiguity in the language of the two paragraphs. Reading the first one by itself, the argument might run, leaves the impression that the $40,000 (plus $10,000 actually paid) was intended as part consideration for transferor appointing Associates its exclusive agent and granting Associates the prerogatives contained in the contract. But we think the latter paragraph explains in detail the character of those sums, indicating that they constituted deposits for future purchases of concentrate by Associates from transferor. That latter paragraph, which is specific in nature, must govern over the former general paragraph.[3] Especially is this so where, reading the contract as a whole, the general purpose of the parties appears to be consistent with that interpretation.[4] After so reading the contract as a whole, we think it is clear that it was primarily one for the sale of goods from transferor to Associates.

The understanding of Donovan Owens, who negotiated the contract for transferor, also supports the aforementioned interpretation. He testified (by deposition) that the $40,000, plus $10,000 actually paid, was regarded as a deposit against purchases of concentrate. It is true that the $10,000 paid to transferor was retained by it despite the fact that no concentrate was ever shipped under the contract. However, this is explained by Donovan Owens' testimony to the effect that transferor's receipt of the $10,000 was taken into account in negotiating the amount of the base rental specified in the superseding December 6, 1945, lease with Distributors.[5]

---

[3] Williston, *Contracts* (rev. ed. 1936), vol. 3, sec. 619, p. 1784: Where there is a repugnancy between general clauses and specific ones, the latter will govern; and even if there is no actual repugnancy if the words of the contract are taken literally, yet when from the whole instrument it appears that the purpose of the parties was solely directed towards the particular matter to which the special clause or words relate, the general words will be restrained. [Footnotes omitted.]

[4] Id., sec. 618, p. 1779: 3. The writing shall be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose. [Footnote omitted.]

[5] Id., sec. 623.

Certain extrinsic facts may also be noted.[6] The cash which Sales paid transferor in part consideration for its distribution contract of January 14, 1939, as well as that paid transferor by Distributors for its distribution contract of January 22, 1945, covering the United States west of the Mississippi River, was a nominal $100. Those contracts were essentially similar in terms to the September 27, 1945, contract here in issue. It appears unrealistic, therefore, that $50,000 would be stipulated as the cash consideration flowing from Associates to transferor for the prerogatives contained in the instant contract.

After carefully considering the above, we hold that the $40,000 represented a deposit, unpaid in 1945, against future purchases of concentrate from transferor by Associates. No sales of concentrate chargeable against that $40,000 were made in 1945. Under these circumstances we think that our decision in *Pacific Grape Products Co.*, 17 T. C. 1097, 1104, 1105, is controlling and that the $40,000 is not reportable by transferor as income accrued in 1945.

Respondent cites in his brief, *inter alia*, *South Dade Farms, Inc.* v. *Commissioner*, (C. A. 5) 138 F. 2d 818, and *South Tacoma Motor Co.*, 3 T. C. 411. Those cases are clearly distinguishable involving, as they do, prepayments *actually received* by the taxpayer in the particular tax year and, consequently, taxable as accrued income under the so-called "claim of right" doctrine. The transferor did not actually receive the $40,000 in 1945. In fact the evidence shows that it never did receive it because of a new contract negotiated before the end of 1945. The facts with reference to this new contract by the Owens Group with Distributors, after the dissolution of Lime Cola Company are found in our Findings of Fact.

5. The final question regards the liability of petitioners (in Docket Nos. 36250, 36251, 36252, and 36253) as transferees for transferor's deficiencies here in issue. Sec. 311 (a) (1), I. R. C. The burden of proving transferee liability rests upon respondent. Sec. 1119, I. R. C., *supra*, footnote 2.

In *J. Warren Leach*, 21 T. C. 70, we stated the elements of transferee liability, as follows:

To hold a party liable as transferee in equity for a transferor's delinquent taxes it must be proved (1) that the alleged transferee received assets of the transferor, and (2) that the transferor was insolvent at the time of, or was rendered insolvent by, that transfer of assets. * * * The transferee is retroactively liable for transferor's taxes in the year of transfer and prior years, and penalties and interest in connection therewith, to the extent of the assets received by him even though transferor's tax liability was unknown at the time of the transfer. * * *

[6] Id., sec. 630, p. 1808: Whatever may be the propriety of admitting evidence of extrinsic facts where the meaning of the instrument is apparently clear, there is no question that such evidence is admissible in every jurisdiction where there is no clear apparent meaning. [Footnote omitted.]

We have found (a) that transferor was dissolved on December 28, 1945, (b) that the aforementioned petitioners were transferor's sole stockholders and each received 25 per cent of its assets upon dissolution, and (c) that as a result of the dissolution transferor was rendered insolvent and unable to pay the tax deficiencies here in issue. Sec. 311 (f), I. R. C.; Regs. 111, sec. 29.311–1; *R. E. Wyche*, 36 B. T. A. 414, 418. Further, we have found that the aggregate value of transferor's assets received by petitioners equaled at least $100,000. Petitioners are, therefore, liable as transferees to the extent of the deficiencies of the transferor which clearly under our holdings herein will be considerably less than the amounts of assets which they each received. Petitioners in their brief do not argue anything about transferee liability; and, although they do not expressly abandon the issue of transferee liability, we presume they no longer press it.

*Decisions will be entered under Rule 50.*