T.C. Memo. 2008-130


UNITED STATES TAX COURT


JOHN O. GREEN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11851-05.                    Filed May 15, 2008.


<u>Charles N. Woodward</u>, for petitioner.

<u>M. Kathryn Bellis</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


HOLMES, <u>Judge</u>:  John Green has not had much success in Tax Court.  In 1993, Green wanted to escape paying income tax on money he'd embezzled ten years earlier, claiming he was exempt because he is a Native American.  We held him liable for both the tax and penalties.  <u>Green v. Commissioner</u>, T.C. Memo. 1993-152, affd. without published opinion 33 F.3d 1378 (5th Cir. 1994).  He

then fought a notice of deficiency for his 2001 taxes, arguing that it wasn't valid because it was based on data not included in his tax return. In fact, he had never filed a 2001 tax return. We sustained both the deficiency and penalties. He also made numerous other frivolous arguments, and we sanctioned him for them as well. Green v. Commissioner, T.C. Memo. 2007-262.

He has returned. In this case, he challenges with hydra-headed interpretations of settled law the deficiencies which the Commissioner determined for his 1997, 1999, and 2000 tax years.

FINDINGS OF FACT

John Oliver Green was born John Oliver Hornung in Oklahoma City in 1947. He joined the Army in 1966 and was honorably discharged in 1969, receiving a 10-percent service-connected disability compensation for allergic rhinitis. He then signed up as an auditor trainee at the IRS.

As he began his IRS career, he was also continuing his education, and eventually he earned degrees in both accounting and law. These helped him move up at the IRS, and he became first a revenue agent and then a criminal investigator. But health issues continued to plague him. In 1973, he unsuccessfully filed for disability after hurting his knee when he tripped over an electrical cord at work. In 1976, he unsuccessfully applied for disability from an eye injury that he claimed had occurred while he was in the Army. In 1978, he

applied for disability-retirement from his position as a criminal investigator after discovering that he had only one kidney. After a year of administrative appeals and an opinion from Green's doctor that supported a finding of disability in this "unusual medical case," the Civil Service Retirement System (CSRS) determined that Green could no longer plan and conduct tax-evasion investigations. CSRS awarded him 40-percent disability-retirement pay. This meant that Green would receive 40 percent of his average basic pay (using 3 consecutive years of work) with inflation adjustments. He would receive this level of pay for his disability-retirement benefit each year if, but only if, his annual earned income didn't exceed 80 percent of the pay of an IRS criminal investigator--the same position he held immediately before retirement. Civil Service Retirement Act (CSRA), 5 U.S.C. secs. 8331-348 (1976 & Supp. II, 1978). To police this condition, the CSRS requires a disability claimant to submit annual income statements.

After securing this civilian retirement benefit, Green applied to the VA for an increase in his military disability compensation on the theory that he might have lost his kidney in a truck accident while he was still in the Army. The VA denied both this request and a later appeal when it found that Green's condition was congenital.

Shortly after leaving the IRS in 1978, Green opened a law office in Oklahoma City.[1] Among his clients were Robert and Linda Schaffer. Mr. Shaffer was an entrepreneur in the business of smuggling illegal drugs. He died in 1982 when his plane crashed in Mississippi while he was making a delivery. Green visited the crash site and helped two of Mr. Shaffer's friends remove his body from the wreckage and bury it. He then began helping Mrs. Shaffer in the distribution of her late husband's estate. She had received $380,000 for the final drug delivery, which she added to the $200,000 already stored in a safe hidden in the floor of her home. She sought Green's advice on how to safeguard this hoard, and Green suggested that Mrs. Shaffer store it in a safe-deposit box that he would rent as trustee for her benefit. Mrs. Shaffer then began getting worried calls from her father-in-law, who had possession of yet more cash from his son's business that he no longer wanted in his home. There was so much that it could not fit in the first safe-deposit box, but Green helpfully suggested putting it in a second safe-deposit box that was in the name of Green's own grandmother.

A few months later, in January 1983, Green told Mrs. Shaffer that the money wasn't secure there and should be moved. Innocent in the ways of the world, Mrs. Shaffer agreed to move the loot

---

[1] This part of his story is told at greater length in <u>Green v. Commissioner</u>, T.C. Memo. 1993-152.

from the first safe-deposit box to Dallas. Green took the money

from the box but, instead of moving it to Dallas, gave Mrs.

Shaffer $40,000 for living expenses and disappeared. It was

about this time that he changed his name from Hornung to Green.[2]

He moved to Austin where he bought a home and several vehicles,

and led a seemingly comfortable life.

It didn't last. The law caught up with him in 1985, and he

was convicted of conspiracy to defraud the United States by

hindering the Commissioner's determination of the Shaffers' tax

liabilities. As a felon, Green lost his license to practice law

and he became a free-lance paralegal after he was released from

prison.

In 1986, the Commissioner sent Green, who was then still in

federal custody, notices of deficiency for underreported 1981 and

1982 income tax. This was the same year that Green's girlfriend

bore the first of three children.

In 1990, the Commissioner and Green settled the dispute over

his 1981 and 1982 income tax liability, but Green never paid the

agreed amount. This prompted the IRS to try to levy on Green's

disability-retirement pay, which was by then administered through

the Office of Personnel Management (OPM). That same year, the

Commissioner assessed income tax on the money Green had stolen

---

[2] He continued to use Hornung off and on for at least a few years in his correspondence with various government agencies.

from the Shaffers in 1983. Once OPM received the notice of levy, it redirected Green's disability-retirement payments to the IRS for payment of his tax debts. Green responded by failing to submit his annual income statements to OPM. OPM then suspended the disability-retirement payments, and the flow of funds to the IRS was effectively stanched.

Green sued OPM in 1996, claiming that his disability retirement was exempt from IRS levy, but he lost. Green v. U.S. Office of Personnel Mgmt., Civil No. A-96-CA-448-SC (W.D. Tex., May 6, 1997). He also filed for bankruptcy, and was released from all dischargeable debts. In re Green, No. 96-13645 (Bankr. W.D. Tex., May 6, 1997). As of November 1997, Green still owed over $50,000 on his 1981 unpaid tax liability, and more than $1.3 million on his 1983 tax liability. By June 30, 1998, however, the same bankruptcy court issued a decision in an adversary proceeding regarding his 1981-83 tax debts. In re Green, No. 97-1044 (Bankr. W.D. Tex. 1998). That decision discharged Green's 1981-82 personal tax liabilities and his 1982-83 business tax debt. The bankruptcy court also ordered a 36-month levy on his OPM benefits in satisfaction of the 1983 tax debt, a debt that wasn't dischargeable due to fraud.

But this ended neither his troubles nor his ingenuity. He resumed submitting income statements to OPM, which released his pent-up disability-retirement payments. But by this time OPM had

also been notified that Green had not been paying child support.
When OPM reinstated the payments, it owed Green a gross amount of
$93,305, reflecting payments due from July 1992 through October
1997. But most of this never flowed out to him--$32,656.40 was
sluiced away to pay part of his outstanding tax liability, and
$60,647.60 cascaded to his ex-wife to pay overdue child support.
OPM sent Green the remaining $1. (There is no clear evidence of
when that $1 made its way to Green.) It also issued him a Form
1099R for tax year 1997 reporting income to him of the entire
$93,305. And it reinstated his disability-retirement pay as of
November 1, 1997, though again withholding most of it to satisfy
his child support and tax debts.[3] OPM included these regular
payments for November and December 1997 on Green's 1099R for the
1998 tax year.

When income payable to a person is shunted away to pay a
debt, it normally still counts as taxable income.[4] This is just
what happened to Green in the years at issue here--1997, 1999,
and 2000. But Green never filed Forms 1040 for those years. Nor
did he make estimated income tax payments. Instead, as he had
done since at least 1991, he sent to the IRS documents called

---

[3] Green received $1,554 as his November 1997 benefit and
$1,586 as his December 1997 benefit. OPM issued him a check for
$1, the amount payable for these two months after garnishment, in
January 1998.

[4] See Old Colony Trust Co. v. Commissioner, 279 U.S. 716,
729 (1929).

"Treaty-Based Return Position Disclosure Under Section 6114."[5]
In these documents, he claimed that he was exempt from taxation
under an 1815 treaty between the United States and the Potawatomi
tribe.[6]  Treaty with the Potawatomies, Sept. 8, 1815, art. 2, 7
Stat. 131.  A footnote in a much tinier font set out his income
for each year.[7]  Accompanying the big-font, little-font assertion

---

[5] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years at issue, and
Rule references are to the Tax Court Rules of Practice and
Procedure.

[6] This is, by the way, a completely frivolous argument.
Green v. Commissioner, T.C. Memo. 1993-152 (holding that the
Treaty with the Potawatomies doesn't immunize tribal Potawatomi
from federal taxation and also stating that "[t]here is no
general, implied exemption from Federal taxation as petitioner
contends"); see also Squire v. Capoeman, 351 U.S. 1, 6 (1956)
("Indians are citizens and * * * in ordinary affairs of life, not
governed by treaties or remedial legislation, they are subject to
the payment of income taxes as are other citizens"); George v.
Commissioner, T.C. Memo. 1989-401 (requiring express exemption in
a statute or treaty for relief from income tax to apply to a
Native American).

[7] Each of Green's disclosure documents for 1997, 1999, and
2000, begins with this paragraph:

   Grounds for treaty-based return position:
        I am a tribal member of the Potawatomi Nation who
   has never been issued a certificate of competency
   (C.C.) or full U.S. citizenship by the U.S. Secretary
   of the Interior as authorized under the Indian
   Citizenship Act of 1924.  My tribal roll number is 3989
   and my Indian status was confirmed by the U.S. Tax
   Court in Green v. Commissioner, 65 TCM 2347 (1993).  I
   have been previously examined for 1991 and 1992 with
   the IRS concluding that a Form 1040 is not required and
   there is no tax liability applicable.  See relevant
   portions of IMF and other IRS documents included as
   Attachment "A."  In 1956, the United States federal

                                          (continued...)

of his tax-exempt status was a cover letter, a summary of

purported legal arguments for his treaty-based return position, a

photocopy of the regulations applicable to section 6114,[8] copies

of computer screen printouts that Green claims show the

Commissioner's agreement with his decision not to file returns, a

long article written by Green himself describing his belief that

---

[7](...continued)
court recognized the tax status of Potawatomis who have
not yet been issued a C.C. by the Secretary of the
Interior holding that "Acts or agreements of Congress
relating to the Potawatomi Indians [are] construed to
give said Indians exemptions from all taxes." *Nash v.
Wiseman*, 227 F.Supp. 552 (W.D. Okla. 1963), *appeal
dismissed* (10th Cir. 1964). The United States, by
treaty, has recognized the Potawatomi as a domestic
sovereignty. *Treaty of 1846* (9 Stat. 853). In the
*Treaty of 1811* (7 Stat. 131), the United States
promised the Potawatomi all "possessions, rights and
privileges, which they enjoyed or were entitled to" in
1811. An explanation of the treaty-based position
taken including a brief summary of the facts on which
it is based is set forth below in Attachment "B."

Green concluded this statement with the phrase "signed under
penalty of perjury." This differs from the jurat provided on
Form 1040, which states: "Under penalties of perjury, I declare
that I have examined this return and accompanying schedules and
statements, and to the best of my knowledge and belief, they are
true, correct, and complete."

[8] Section 6114 requires a taxpayer who takes the position
that a treaty of the United States overrules or modifies a
section of the Code to disclose his position either on his tax
return or on a statement attached to the required return. If the
Code doesn't require a return for him, the taxpayer must use
whatever form the Secretary provides (in this case, Form 8833).

tribal Potawatomi are exempt from income tax, and copies of caselaw supposedly supporting his arguments.[9]

In 2003, the IRS mailed notices of deficiency to Green for tax years 1997 through 2000, but used the wrong mailing address. Green filed a petition, but it was dismissed for lack of jurisdiction on the Commissioner's own motion because of that snafu. The Commissioner then mailed the notices to the right address and Green filed another petition (carefully omitting the 1998 tax year). Trial was held in Houston--Green was a resident of Texas when he filed his petition.

## OPINION

Green now admits that his status as a tribal Potawatomi doesn't relieve him of the obligation to pay income taxes. He does, however, argue that his "treaty-based return position disclosures" (we'll call them the "disclosure" documents) were tax returns and so triggered the running of the statute of limitations. If that doesn't work, he argues that the Commissioner is collaterally estopped from raising the issue of whether his disability-retirement pay is taxable. If that fails, he claims that his disability-retirement pay is nontaxable income under sections 104 and 105. If it isn't, then he claims that the Commissioner should have included the lump-sum payments in his

---

[9] Green was able to produce only copies of the cover letter and first page of his disclosure document for the 1999 tax year.

1998 deficiency, not his 1997 deficiency.[10]  And, finally, he argues against the imposition of any penalties for any of the years at issue.

I.   Statute of Limitations

Section 6501(a) generally prohibits the IRS from assessing a deficiency after three years from the time a taxpayer files his return.  But if a taxpayer fails to file a return, there is no time limit at all.  Sec. 6501(c)(3).  Green admits that he didn't file Forms 1040 for any of the three years in question.  But, of course, he says that his "disclosure" documents--though not a regular IRS form--nevertheless are a "return".

The Commissioner first contends that it doesn't matter if those documents are returns, because he never received any documents from Green for the years in question.  Green has certified mail receipts, however, showing that he mailed something to the IRS Service Center in Philadelphia on April 15, 1998, April 17, 2000, and April 16, 2001.  He also has receipts showing he mailed something to the Ogden, Utah, Service Center on April 17, 2000, and to the Austin Service Center on April 16, 2001.  These receipts and Green's testimony on this subject are convincing, and so we find that Green submitted his "disclosure" documents on the dates and to the locations that he claims he

---

[10] Remember that his petition carefully omitted any challenge to the Commissioner's determination of a much smaller deficiency for 1998.

did. Of course, this establishes only that Green filed his "disclosure" documents with the IRS Service Centers, and not that the documents were sufficient as tax returns to begin the running of the statute of limitations.

On the question of whether these "disclosure" documents were Green's 1997, 1999, and 2000 returns, we begin by noting the similarity between those documents and an actual IRS form, Form 8833. Form 8833 is designed for use by taxpayers who rely on a treaty to support a position they're taking on their returns. The form is a convenient way for taxpayers to meet their obligation under section 6114 to tell the IRS that they're asserting rights given to them by treaty and point the IRS to the particular treaty involved. The instructions for Form 8833 require a taxpayer to attach the completed Form 8833 to his tax return. What Green did instead was to entitle his own document with a name similar to Form 8833's "Treaty-based return position disclosure under section 6114," and submit it without attaching it to any other income tax forms.

The test for whether Green's "disclosure" documents are tax returns has four parts, as described in Beard v. Commissioner, 82 T.C. 766, 777 (1984), affd. per curiam 793 F.2d 139 (6th Cir. 1986):

- The document must purport to be a return;
- the taxpayer must execute the return under penalty of perjury;

- there must be sufficient data to calculate
  tax liability; and

- the taxpayer must have made an honest and
  reasonable attempt to satisfy the requirements
  of the law.[11]

A.   Do the Documents Green Submitted Purport to be
     a Tax Return?

The documents filed by Green nowhere state that they are his

income tax returns for the years at issue.  Green bluntly says in

the "disclosure" documents that he isn't required to file a tax

return because, as a tribal member of the Potawatomi Nation, he

is exempt from Federal income tax.[12]  Green argues that his

---

[11] The Beard test may not apply when Form 1040 isn't
required, because the Code sometimes allows a taxpayer to file
returns not requiring all of the information demanded by the Form
1040 or the Beard test.  See Janpol v. Commissioner, 102 T.C.
499, 502 (1994); Mendes v. Commissioner, 121 T.C. 308, 331-33
(2003) (Goeke, J., concurring).  Green relies on Janpol to argue
that the Beard test might not apply to define what a "return" is
under section 6114.  We disagree--Beard is the general test, and
Janpol is just a recognition that the test is subject to
exceptions specifically found in the Code and regulations.

[12] Green may also be arguing that he submitted his homemade
forms under the belief that he qualified for a treaty-based
position under section 6114(a)(2), providing for disclosure of a
position "if no return of tax is required to be filed, in such
form as the Secretary may prescribe."  The Secretary, however,
has by regulation prescribed that taxpayers asserting that a
treaty overrules the Code generally must file a return, even if
they otherwise wouldn't have to.  Sec. 301.6114-1(a)(1)(ii),
Proced. & Admin. Regs.  There are exceptions, sec. 301.6114-1(c),
Proced. & Admin. Regs., but Green's position isn't one of them.
                                                  (continued...)

"disclosure" documents are nevertheless implied tax returns, and, as such, should be considered returns under section 6501. That's not good enough. For a document to "purport to be a return" means that it must "convey, imply or profess outwardly" to be a return. See Beard, 82 T.C. at 778. We find that Green's disclosure documents actually imply that they are *not* returns, and Green can't now pretend that they are.

His position also holds little weight in light of the IRS's need for uniformity, clarity, and efficiency. In a similar case where a taxpayer altered a standard Form 1040 by whiting out portions of the text, retitling captions, and attaching a disclaimer denying tax liability, we "refuse[d] to require [the IRS] to engage in guessing games to determine what disclaimers * * * mean. To require such would drastically hinder the Commissioner's ability to process returns effectively and efficiently." Williams v. Commissioner, 114 T.C. 136, 142-43 (2000). Green's documents are a little more than an effort to subvert the filing process.

B.    Did Green Execute the Return Under Penalty of Perjury?

Signing under penalty of perjury means that a taxpayer can't delete or alter the jurat language found in standard IRS forms.

---

[12](...continued)
(And even if his "disclosure" documents were a return, he would still have had to attach a real Form 8833 to them. See sec. 301.6114-1(d)(1), Proced. & Admin. Regs.)

See, e.g., <u>Williams</u>, 114 T.C. at 139-42; <u>Sloan v. Commissioner</u>, 102 T.C. 137, 143 (1994), affd. 53 F.3d 799 (7th Cir. 1995).  But that's what Green did on his documents.  He simply signed them "under penalty of perjury", without the usual jurat language, so we find that he didn't properly execute his documents under penalty of perjury.

C.   <u>Did Green Provide Sufficient Data to Calculate His Tax Liability</u>?

The Commissioner also argues that, although Green disclosed certain items of income and expense in a footnote in a tiny font, he neglected to provide information regarding his marital status, exemptions, or deductions.  Here again, the Commissioner is right--we have held that a document purporting to be a return must include this information if it is to provide sufficient data to calculate tax liability.  See <u>Galuska v. Commissioner</u>, 98 T.C. 661, 670 (1992), affd. 5 F.3d 195 (7th Cir. 1993); see also <u>Sanders v. Commissioner</u>, 21 T.C. 1012, 1018 (1954), affd. 225 F.2d 629 (10th Cir. 1955); <u>Halcott v. Commissioner</u>, T.C. Memo. 2004-214.  We also don't believe the IRS should need a magnifying glass to do its job.  We therefore find that the part of the <u>Beard</u> test requiring "returns" to provide data sufficient to calculate tax liability isn't met.

D.  Was There an Honest and Reasonable Attempt to Satisfy the Requirements of the Law?

The final part of the Beard test requires that a document offered as a tax return be an "honest and reasonable" attempt to satisfy the requirements of the law.  Green argues that is exactly what his "disclosure" documents were.  This part of the Beard test has caused problems for some courts because of an ambiguity that's never been fully resolved:  Does the "honest and reasonable attempt" requirement call for an examination of the subjective intent and abilities of a taxpayer, or does it call for an objective test limited to an examination of the data provided on the face of the document itself?

In many of our cases, we've found that a tax protester's altered or self-made return cannot meet the honest-and-reasonable standard.  We have found that frivolous claims on the face of a document show both subjective dishonesty and objective unreasonableness.  See, e.g., Lange v. Commissioner, T.C. Memo. 2005-176.  But in Beard itself we acknowledged that fraudulent returns may be valid (though subjectively dishonest) if the taxpayer objectively supplies the information in the prescribed manner.  Beard, 82 T.C. at 778-79 (citing Badaracco v. Commissioner, 464 U.S. 386, 397 (1984)).  We have also considered, in some cases, the taxpayer's intent and the facts and circumstances surrounding the document's filing.  See Dunham v. Commissioner, T.C. Memo. 1998-52 (considering the taxpayer's

education and intent in determining his filing attempt wasn't honest and reasonable).  But we ourselves do not seem to have decided whether this part of the test is meant to be objective or subjective--leading to different approaches in other courts.[13]

The controversy has been hottest in bankruptcy cases, where the discharge of a tax debt under 11 U.S.C. section 523(a)(1)(B)(i) turns on whether a debtor filed a valid tax return.  (There's an obvious parallel to cases where a protester wants his documents to be a valid return to start the running of the statute of limitations.)  The debate is whether late filing (presumably intended to qualify the debtor for tax-debt relief) is *per se* invalid under the "honest-and-reasonable" prong of Beard.

One of the most significant decisions in this area is United States v. Payne, 431 F.3d 1055 (7th Cir. 2005).  Judge Posner took the subjectivist approach, arguing that "return" can mean different things in different contexts and pointing out the anomaly of treating a fraudulent return as a valid return.  Judge Easterbrook, dissenting, argued for an objective standard:

---

[13] For a subjective approach, see United States v. Hatton, 220 F.3d 1057, 1061 (9th Cir. 2000); United States v. Klein, 312 B.R. 443, 447 (S.D. Fla. 2004); Moroney v. United States, 352 F.3d 902, 907 (4th Cir. 2003); Hindenlang v. United States, 164 F.3d 1029, 1035 (6th Cir. 1999); Miniuk v. United States, 297 B.R. 532, 536 (Bankr. N.D. Ill. 2003).  For an objective approach, see In re Colsen, 322 B.R. 118, 125-26 (B.A.P. 8th Cir. 2005), affd. 446 F.3d 836 (8th Cir. 2006) and its successor, Colsen v. United States, 446 F.3d 836, 840 (8th Cir. 2006).

"Motive may affect the *consequences* of a return, but not the definition."  Id. at 1062 (emphasis in original); see also Colsen v. United States, 322 B.R. 118, 125-26 (B.A.P. 8th Cir. 2005), affd. 446 F.3d 836, 840 (8th Cir. 2006) ("With due regard to the opinions of the other circuits, we find Judge Easterbrook's arguments persuasive.")

We are leery of finding ourselves in this titanomachy.[14] And we can scurry away from the dispute till another day.  Green submitted self-made documents that did not objectively permit the assessment of his tax liability.  See Williams v. Commissioner, 114 T.C. at 143 (finding that a taxpayer's "denial of tax liability and refusal to self-assess [did] not evidence a reasonable attempt to satisfy his obligation to file a return under the tax laws"); Jarvis v. Commissioner, 78 T.C. 646, 654 (1982) ("the government should not be forced to accept as a return a document which plainly is not intended to give the required information.").

Green also didn't base their submission on an honest belief either that his documents were such a return or that he was exempt from filing--his previous loss in this Court should have

---

[14] The deep and boundless sea resounded all around,
the earth boomed and the wide sky above shook
and groaned while lofty Olympos heaved from its foundation
in the whirl of missiles flung by the immortals.

Hesiod, Theogony, ll. 676-81, at p. 30 (Apostolos N. Athanassakis trans., Johns Hopkins Univ. Press 1983).

alerted him to the unreasonableness of his position.  In 1993, we explained to him that there is no implied general exemption from income tax for Native Americans.  Green v. Commissioner, T.C. Memo. 1993-152.  We also held that the treaty he relied on in both the 1993 case and in his "disclosure" documents "does not represent a recognition of immunity of tribal Potawatomi from Federal taxation."  Id.  Enough--Green wasn't being honest or reasonable.[15]

E.    Did the IRS Accept Green's Returns Without Objection, Thereby Violating Internal Rules of Conduct?

Green next argues that he is entitled to a presumption that his documents were adequate tax returns because he didn't receive notice from the Commissioner telling him that they weren't.  This argument has several flaws.  First, Green requested in the cover letters accompanying his disclosure documents that the IRS return stamped copies to him.  The fact that he didn't receive stamped copies should have alerted him that the IRS wasn't treating them as normal returns.  Second, although Green relies on the Internal Revenue Manual (IRM) for proof that the Commissioner committed a procedural default, courts have consistently held that the IRM doesn't create rights in a taxpayer.  See, e.g., Oxford Capital

---

[15] Green contends that a more recent case, Wagnon v. Prairie Band Potawatomi Nation, 546 U.S. 95 (2005), bolsters his previous stance.  It doesn't, and since it was decided well after he filed his "disclosure" documents for the years at issue, he could not have reasonably relied on anything in that opinion for his position.

Corp. v. United States, 211 F.3d 280, 285 n.3 (5th Cir. 2000); see also Cargill, Inc. v. United States, 173 F.3d 323, 340 n.34 (5th Cir. 1999) (similar rule for HHS manual).  Green has thus failed to show that his filings should be presumed sufficient, e.g., violations of the IRS's own internal bureaucratic procedure.

Because we find that Green never filed tax returns for years 1997, 1999, and 2000, the statute of limitations doesn't bar the Commissioner from assessing deficiencies for those years.[16]

II.  Income in 1997, 1999, and 2000

Green doesn't stop with his statute-of-limitations argument, but also contends that the Commissioner substantively erred in determining deficiencies for tax years 1997, 1999, and 2000. Green first claims that the Commissioner is collaterally estopped from arguing that his disability-retirement pay is subject to income tax.  If estoppel doesn't work, he then argues that this pay is excluded from his income by section 104 or 105.  And if those sections don't work, he contends he didn't receive some of that pay in 1997, as the Commissioner asserts, but only in 1998, a tax year not before us.

---

[16] The Commissioner amended his answer before trial when he discovered that Green had additional unreported income from paralegal services for tax year 1997.  Green's only argument in response was that the statute of limitations bars assessment. With our conclusion that the statute does not bar this action, we find in the Commissioner's favor on this minor issue.

A.   Collateral Estoppel

Both Green and the Commissioner agree that, in the course of negotiating the end of the case arising from Green's 1993 tax year, the Commissioner conceded that Green didn't owe tax on the disability-retirement payments that he received.  See Green v. Commissioner, T.C. Memo. 1993-152.  Green now argues that this prior concession collaterally estops the Commissioner in this case.

One of the requirements for collateral estoppel, however, is that the parties must have actually litigated the issue as a necessary part of an earlier case.  Peck v. Commissioner, 90 T.C. 162, 166-67 (1988), affd. 904 F.2d 525 (9th Cir. 1990).  Green recognizes that a concession by the Commissioner can hardly meet the requirement that an issue be actually litigated and necessarily decided, but nevertheless cites United States v. Brekke, 97 F.3d 1043, 1049 (8th Cir. 1996), where the court refused to apply collateral estoppel because there was no evidence that the parties intended to preclude further litigation of the issue; and Adolph Coors Co. v. Commissioner, 519 F.2d 1280, 1283 (10th Cir. 1975), affg. 60 T.C. 368 (1973), where the court refused to apply collateral estoppel to a particular issue because the Commissioner had abandoned it.  From these morsels, he cooks up an argument that collateral estoppel applies unless the parties do not intend to preclude further litigation or one

party abandons an issue. Because a concession is neither an agreement not to later contest the issue nor (in his view) the same as "abandoning" the issue, he reasons collateral estoppel must apply.

We're not biting--the test remains whether the issue was actually litigated and necessary to the judgment. And whether tagged "abandonment" or "concession", the Commissioner's decision for the 1993 tax year doesn't estop him from contesting the exclusion of Green's disability-retirement pay from his taxable income in this case. See Green v. United States Office of Personnel Mgt., Civil No. A-96-CA-448-SC (W.D. Tex. May 6, 1997) (rejecting Green's argument that the Tax Court decision incorporating the Commissioner's concession made his disability-retirement pay forever nontaxable).

The Commissioner is thus not collaterally estopped from fighting this issue here.

B.    Is Green's Disability-Retirement Pay Excludable from His Income?

Green argues that we should exclude his disability-retirement pay from his income under sections 104 and 105.[17]

---

[17] Although Green mentions section 72 in the table of contents of his brief, he fails to argue for relief under that section. We therefore consider waived any possible issues raised under that section, as well as the other items listed in the notice of deficiency but left uncontested by Green at trial or in his brief. See Bradley v. Commissioner, 100 T.C. 367, 370 (1993); Lime Cola Co. v. Commissioner, 22 T.C. 593, 606 (1954).

Section 104(a)(1) concerns income received as workmen's compensation. Section 104(a)(2) excludes from income tort damages received on account of personal injury. Sections 104(a)(3) and 105(a) address payments from accident or health insurance. And section 105(c) excludes certain types of income related to the loss of a member or function of the body.

As a preliminary matter, we must decide under what authority the Government granted Green disability-retirement pay back in 1978. Green argues that the Government approved his disability retirement under the Federal Employees' Compensation Act (FECA), 5 U.S.C. sec. 8101-193 (1976 & Supp. II, 1978). Under that statute, disability-retirement pay is awarded only for a injury "sustained while in the performance of * * * duty". Id. sec. 8102(a). We find, however, that Green received his disability retirement under the Civil Service Retirement Act (CSRA), 5 U.S.C. secs. 8331-348 (1976 & Supp. II, 1978). The record shows that, after appealing more than once, Green finally convinced his employer that his monorenality, when combined with the dangers of his position, had the potential to cause him health problems. This condition was congenital, not caused by an injury suffered while at work. We can thus conclude that he didn't receive disability retirement based on any injury that occurred while he was working.

### 1.   Excludability Under Section 104(a)

Section 104(a) provides in part:  "gross income does not include * * * amounts received under workmen's compensation acts as compensation for personal injuries or sickness."  The regulations allow exclusion if the taxpayer receives the pay "under a statute in the nature of a workmen's compensation act." Sec. 1.104-1(b), Income Tax Regs.

Green argues that CSRA is this type of statute.  The key question is:  "What does it mean to be 'in the nature of a workmen's compensation act?'"  And we've already answered this question many times in other cases.  See, e.g., Givens v. Commissioner, 90 T.C. 1145 (1988); Take v. Commissioner, 82 T.C. 630 (1984), affd. 804 F.2d 553 (9th Cir. 1986); Haar v. Commissioner, 78 T.C. 864 (1982), affd. 709 F.2d 1206 (8th Cir. 1983); Neill v. Commissioner, 17 T.C. 1015 (1951); Byrne v. Commissioner, T.C. Memo. 2002-319.

The cases distinguish among three types of statutes:

- Statutes awarding disability pay only for work-related injuries;

- statutes awarding disability pay for both work-related and non-work-related injuries, but pursuant to separate and independent clauses; and

- statutes awarding disability pay regardless of whether the injuries triggering the award are work related.

Awards under the first type of statute are excludable under section 104(a)(1) as analogous to workmen's compensation

payments, even if the statute involved isn't labeled "workmen's compensation."  Awards under the second type of statute--a "dual purpose statute"--may be excluded depending on the circumstances of the case and looking particularly at whether the payments were granted under the qualifying portion of the statute at issue. And awards under the third type of statute are not excludable because they impose no requirement that the compensated injury have been suffered on the job.  Haar v. Commissioner, 78 T.C. at 868;[18] see also DeBiasi v. Commissioner, T.C. Memo. 1983-161.

We have already found that Green receives disability-retirement pay under the CSRA, not the FECA.  And in Haar, we held that "a statute will not be considered akin to a workers' compensation act if it allows for disability payments for any

---

[18] It should be noted that in Burgess v. Commissioner, T.C. Memo. 1986-228, affd. 822 F.2d 61 (9th Cir. 1987), we reviewed Haar and found the state statute at issue had language similar to the CSRA's--that is, the state statute provided for disability payments whether or not the injury occurred while the firefighter was on duty.  We however held that the state statute was similar to a workmen's compensation act because the taxpayer was receiving payments as a result of a work-related injury.  We explained that:

> A statute with a dual purpose of providing workmen's compensation benefits and retirement benefits may meet criteria for exclusion of benefits under section 104(a)(1).  That is, if particular benefits can be received only for duty related injury or sickness, it will then qualify as a payment from a statute "in the nature of a workmen's compensation act * * *."

Id.  Even if Green relied on this case, his lack of a second functioning kidney isn't the result of a work-related injury and the Burgess analysis wouldn't apply.

reason other than on-the-job injuries." Haar v. Commissioner, 78 T.C. at 868. We then clearly disqualified payments under the CSRA because the CSRA authorizes non-work-related injury compensation. In Merker v. Commissioner, T.C. Memo. 1997-277, we again stated that the "relevant inquiry is into the nature of the statute pursuant to which the payment is made and not the source of the particular taxpayer's injury. * * * Thus, if the statute does not qualify, the fact that the taxpayer's injury was in fact work related is irrelevant."

Because the CSRA allows disability retirement whether or not the injury occurred on the job, we again hold that that statute isn't in the nature of a workmen's compensation statute and find that Green's disability-retirement pay is not excludable from taxable income under section 104(a)(1).

2. Excludability under section 104(a)(2)

Section 104(a)(2) excludes from gross income damages received "on account of personal physical injuries or physical sickness." The regulations require damages excluded under this subsection to be "received * * * through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Sec. 1.104-1(c), Income Tax Regs.

Green argues that the Merit Systems Protection Board (MSPB) approved his disability-retirement pay after an appeal process,

and that its decision qualifies as a "settlement" within the scope of section 104(a)(2).  Whether or not the decision was a "settlement," Green overlooks the two requirements for exclusion: (1) The damages received must be on account of personal injury, and (2) they must stem from a tort or tortlike claim.  P & X Mkts., Inc. v. Commissioner, 106 T.C. 441, 443-44 (1996) (citing Commissioner v. Schleier, 515 U.S. 323 (1995)), affd. 139 F.3d 907 (9th Cir. 1998).

Green's disability-retirement pay fails both requirements. His payments weren't awarded for an injury that he suffered as a criminal investigator with the IRS; he received them because the MSPB found he couldn't meet the physical requirements of his position due to a congenital condition.  Those benefits are also conditional on Green's not earning too much income each year, further proof that they are economic compensation, not damages for personal injury.  See Dotson v. United States, 87 F.3d 682, 685 (5th Cir. 1996).  And they don't stem from a tort or tortlike claim, either, but are a benefit from his contract of federal employment.  See Flaherty v. Commissioner, T.C. Memo. 1987-61. We therefore find that Green can't escape taxation using section 104(a)(2).

### 3.   Excludability Under Sections 104(a)(3) and 105(a)

Sections 104(a)(3) and 105(a) work together to exclude from gross income payments that a taxpayer receives from "accident or

health insurance" to the extent that a taxpayer's employer has paid the premiums. Green argues that his disability-retirement payments should be partially excluded from his income, because they are partially attributable to his own contributions for disability insurance that he made while an IRS employee. He also has to argue that the phrase "accident or health insurance" includes "disability insurance."

His success on this point depends on whether the Civil Service Retirement and Disability Fund--to which he contributed through payroll deductions while he was still with the IRS-- qualifies as "accident or health insurance." We have consistently held that it doesn't, because the Fund is both a retirement and a disability plan. Laws v. Commissioner, T.C. Memo. 2003-21; Bagnell v. Commissioner, T.C. Memo. 1993-378; Chosiad v. Commissioner, T.C. Memo. 1980-408. When a plan is "mixed" like this, the regulations provide that if the plan doesn't expressly distinguish between employee and employer contributions in the payment of accident or health benefits, it is presumed that the benefits are attributable to employer contributions. Sec. 1.72-15(c)(2), Income Tax Regs. This means that the benefits paid from this fund are includable in gross income under section 105(a). Bagnell, supra; Chosiad, supra. That Green contributed some part of his salary to the Fund doesn't prove that any portion of those contributions paid for

the disability component of his benefits, so he is taxable on his entire disability-retirement annuity.

### 4.   Excludability Under Section 105(c)

Section 105(c) excludes from gross income amounts payable under an accident or health insurance policy "for the permanent loss or loss of use of a member or function of the body, or the permanent disfigurement, of the taxpayer * * * [that] are computed with reference to the nature of the injury without regard to the period the employee is absent from work."

Green trips over four hurdles here.  The first is that the benefits must be paid under an accident or health insurance plan. Green's disability-retirement pay isn't.

And he also stumbles over the requirement that his injury be one of the specific type listed in the statute.  We've long held that injuries qualifying for exclusion under section 105(c) must fall into one of three categories: (1) The permanent loss or loss of use of a member of the body; (2) the permanent loss or loss of use of a function of the body; or (3) permanent disfigurement. Hines v. Commissioner, 72 T.C. 715, 718 (1979).

We've defined the phrase "member of the body" to refer to an extremity such as an arm, a leg, or a finger. Id. at 719.  A kidney doesn't qualify.  We have also long held that a "loss * * * of a function of the body" requires the loss of a physical ability a taxpayer once had.  Id. (damage to heart tissue not

loss of bodily function because taxpayer still able to live a normal life); cf. <u>Stolte v. Commissioner</u>, T.C. Memo. 1999-271 (inability to use arms, hands, and feet in the same way is loss of bodily function).  Green did not lose a bodily function when he discovered that one of his kidneys was missing, both because his condition was congenital (he never lost a second kidney) and his condition, though serious, did not prevent him from leading a normal life.

Green's disability-retirement pay also fails to satisfy the remaining requirements of section 105(c).  For the benefits to be excludable, the CSRA must itself require variation in benefits according to the type and severity of the injury.  <u>Rosen v. United States</u>, 829 F.2d 506, 509 (4th Cir. 1987); <u>Estate of Olsen v. Commissioner</u>, T.C. Memo. 1989-50.  Green's disability-retirement pay, in contrast, is based on his compensation and length of service in his IRS job.  We've already held that the "provisions of the Civil Service Retirement Act * * * do not correlate the type and amount of disability payments with the particular type of injury causing the disability".  <u>Id.</u>  See also <u>Maller v. Commissioner</u>, T.C. Memo. 1984-614.

Finally, Green's disability-retirement payments aren't unrelated to his absence from work.  The CSRA provides that payments will cease if he is ever reemployed in any position with the Federal Government.  5 U.S.C. sec. 8337(d) (Supp. II, 1978).

This shows a connection between the length of his absence from government service and the continuation of his disability-retirement pay.

Section 105(c) thus doesn't exclude his disability-retirement pay from his gross income.

C.   Constructive Receipt

Green's final argument about the taxability of his disability-retirement pay is that, even if it is taxable, the Commissioner is trying to tax him on part of it in the wrong year.  This argument affects a substantial retroactive payment of $93,305 for a period beginning in 1992 and continuing until the end of October 1997.  Green now argues that he didn't receive this retroactive pay in 1997 because OPM waited until 1998 to pay overdue child support to his ex-wife, and the IRS did not credit his account until well into 1998.  (Remember that Green didn't contest his 1998 notice of deficiency, so it would be too late for the Commissioner to tax this income for the 1998 tax year.)

The law generally requires a cash-basis taxpayer like Green to report an item of income in the year he receives it.  Sec. 451(a).  Actual receipt isn't necessary--for example, if the money goes directly to pay off a taxpayer's debt to a third party, it's considered "constructively" received.  The regulation obliges a taxpayer to report income that isn't actually received if it's "credited to his account, set apart for him, or otherwise

made available so that he may draw upon it at any time." Sec. 1.451-2(a), Income Tax Regs.

The key language in this case is "credited to his account" and "set apart for him." Once Green resumed submitting income statements to OPM in 1997, OPM determined that it owed Green retroactive disability-retirement pay of $93,305. The critical exhibit is a computer printout dated December 16, 1997, that shows approval for a nonrecurring payment of $93,305 reduced by deductions totaling $93,304. It is undisputed that the money for overdue child support did not make its way to Green's ex-wife until May 1998; similarly, the IRS did not note a credit on Green's unpaid taxes until June 1998.

This creates a problem--does the constructive-receipt doctrine depend on when a creditor gets paid, or when the money from which a creditor gets paid is first set aside for the benefit of the creditor? We begin with the regulation that measures receipt as of when income is "set apart for" a taxpayer. Sec. 1.451-2(a) Income Tax Regs. That occurred no later than December 16, 1997 in the OPM records--by that time, Green had filed the required paperwork and OPM recognized him as entitled to the money and reinstated him as eligible for future payments. It was Green himself who sent the court-ordered garnishment instructions to OPM, informing the agency that it should withhold

part of his retroactive disability-retirement pay to satisfy his child support obligations.

This, we hold, was enough to put Green in constructive receipt of $93,304 of the lump sum in 1997. The money had been set apart, and he himself had told OPM what to do with it. That OPM delayed doling it out until 1998 doesn't matter to our holding that Green constructively received the income in 1997.[19] There are a few analogous situations in the caselaw. In Amos v. Commissioner, 47 T.C. 65 (1966), the Commissioner had levied against a taxpayer's monthly annuity payments from an insurance company. The insurance company actually sent a lump-sum check to the Service in July 1962, representing monthly payments from 1961 as well. We held that the taxpayer had to include the 1961 portion of the lump sum in his 1961 income even though it wasn't turned over until 1962. Id. at 68, 70. Similarly, in Burkes v. Commissioner, T.C. Memo. 1998-61, we looked at a lump-sum payment from a late-1990 garnishment of wages owed to a taxpayer and paid over to his ex-wife's divorce lawyer for both alimony and attorney's fees. The garnished wages went into a state-court account, from which two checks were written to the ex-wife's counsel: The first check was disbursed on December 27, 1990; and

---

[19] Neither party discussed the possibly interesting point that the OPM is just another part of the U.S. government--making the "distribution" to the IRS perhaps more of a setoff--and thus we won't analyze the problem from that perspective.

the second on January 8, 1991.  Both checks were deposited into a client trust account, and were not disbursed to the ex-wife until 1991.  Nevertheless, we gave the husband a deduction for the full amount of the lump sum that had been garnished in his 1990 tax year, recognizing that "[d]ue to the time delay between the garnishment and payment * * * some inconsistencies result concerning the reporting of the alimony."[20]  Id.

We therefore hold in this case that the Commissioner is right to allocate $93,304 to Green's 1997 income.  That leaves a bit of a puzzle as to the remaining $1.  There is a $1 check dated January 2, 1998 in the record, but we are persuaded by the OPM's explanation of those first monthly payments that the $1 check is what's left over from Green's first two regular monthly

---

[20] One must carefully distinguish cases like Farr v. Commissioner, 11 T.C. 552, 563 (1948), affd. sub. nom. Sloane v. Commissioner, 188 F.2d 254 (6th Cir. 1951); and Stone v. Commissioner, T.C. Memo. 1984-187.  This line of cases, though featuring IRS liens or levies that deprived a taxpayer of control over funds, each also featured conditions of escrow that had not yet been met.  There, the ownership of the funds in escrow remained in dispute, and the taxpayers were not taxed on the income until it was paid over to the IRS in satisfaction of their debts at the time ownership over the funds was resolved.  In these cases, then, we held that there was not yet a constructive receipt of income.  Green's situation, like that of the taxpayers in Amos and Burkes, is different: But for the levy (or lien or garnishment), the taxpayers would have an unfettered right to the money.  In Amos, we allowed the taxpayer to deduct interest paid to the IRS in satisfaction of tax liability when the income would have been paid over to him, even though the IRS did not actually receive the payment until the following year.  We therefore regard those funds as constructively received when the levy (or lien or garnishment) attaches to them.

payments that all agree he began receiving in 1998. That suggests there might be another $1 check left over from the lump-sum payment. If such a check had also been sent to Green in January 1998, its taxability would be governed by the general rule that a check is treated as income when received. Kahler v. Commissioner, 18 T.C. 31, 34-35 (1952). But because we have no clear evidence as to when he received that possible $1 payment, we find that Green fails to meet his burden of proof that the $1 should be taxed in 1998, so he is taxable on $93,305 and not just $93,304, in 1997.

We therefore find that Green's income from the lump-sum distribution at the end of 1997 is increased by the full $93,305 listed in the notice of deficiency.[21]

III. Additions and Penalties

The only remaining issues are whether Green owes the addition to tax under section 6651(a)(1) for failure to timely file a tax return, and the penalty under section 6654 for failure to pay estimated tax.

---

[21] OPM sent Green a Form 1099R for 1997 that showed the lump sum as paid in 1997. Green challenges the accuracy of this form, contending that it makes the notice of deficiency itself arbitrary and capricious. But the form itself is consistent with an OPM letter to Green that's also in the record, in which OPM explained that benefit payments are payable on the first day of the month following their accrual. Green's retroactive lump-sum payment accumulated through October 1997, meaning that OPM regarded itself as owing Green the money before the end of 1997.

A.    Addition to Tax For Failure to File

The Code imposes an addition to tax if a taxpayer fails to timely file a required return, unless he can show that his failure was due to reasonable cause and not willful neglect. Sec. 6651(a)(1).  To show reasonable cause, Green must prove he exercised ordinary business care and prudence and nevertheless was still unable to file as required.  Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.; United States v. Boyle, 469 U.S. 241, 245 (1985).  Willful neglect means a "conscious, intentional failure or reckless indifference."  Id., at 245.

We've already found that Green's "disclosure" documents weren't tax returns.  We must now consider whether or not Green exercised ordinary business care and prudence in continuing to rely on his notion that Potawatomi are exempt from tax.  Cf. Coulton v. Commissioner, T.C. Memo. 2005-199 (finding a tax protester's efforts unreasonable for purposes of section 6651). On this issue, we have to side with the Commissioner--Green has a legal education and practiced tax law.  He should have known better than to continue making such a frivolous argument.  Surely in the 27 years since he began his career in tax, he should have learned enough to recognize that his "disclosure" documents were not based on any reasonable understanding of the law.

We also find that Green was willfully negligent in his efforts to comply with filing requirements.  On the face of his

disclosure documents he doesn't even claim to file the correct forms with the required information.

B.    Penalty for failure to make estimated tax payments

Section 6654 imposes a penalty when a taxpayer fails to make estimated tax payments during the year.  Sec. 6654(a) and (b). The estimated tax that's required is the lesser of 90 percent of the tax due or 100 percent of the tax shown on the previous year's return, if filed.  Sec. 6654(d)(1)(B).

The Commissioner has the burden of showing that Green owes the penalty.  He met his burden by proving that Green's returns for 1996 and 1998 would have shown a tax liability had he filed them correctly.  The Commissioner also showed that Green owes tax for tax years 1997, 1999, and 2000.  That's all that is required to find that Green owes a section 6654 penalty.[22]  Because the Commissioner did show additional unreported income, and to reflect the various concessions of both parties,

Decision will be entered

under Rule 155.

--------

[22] The two mechanical exceptions--for an unpaid tax of $1,000 or less, sec. 6654(e)(1); or for failing to make estimated tax payments in a year immediately following a year when the taxpayer didn't have to file, sec. 6654(e)(2)--don't apply to Green.