T.C. Memo. 1999-27


UNITED STATES TAX COURT


JAMES J. AND SANDRA A. GALES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4345-97.                    Filed February 1, 1999.


        P received advance commissions on insurance
written by him.  The advance commissions were repayable
on demand, and bore interest, and repayment was secured
by earned commissions.  Such advance commissions were
shown as income on Forms 1099-MISC, Miscellaneous
Income, received by P.  <u>Held</u>, Ps have proven the amount
of advance commissions.  <u>Held</u>, <u>further</u>, the advance
commissions were received as loans and are not gross
income.


<u>S. Thomas Ullman</u>, for petitioners.

<u>Thomas E. Ritter</u>, for respondent.


        MEMORANDUM FINDINGS OF FACT AND OPINION


        HALPERN, <u>Judge</u>:  By notice of deficiency dated December 6,

1996, respondent determined deficiencies in petitioners' Federal

income taxes for 1992 and 1993 of $10,778 and $56,165, respectively.  Petitioners assign error to some of respondent's determinations on the basis that respondent erred in treating certain advance commissions as compensation rather than as loans. Petitioners also claim that petitioner Sandra A. Gales is an innocent spouse who should be relieved of liability on account of that status.[1]

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Introduction

Some facts have been stipulated and are so found.  The stipulations of facts, with attached exhibits, are incorporated herein by this reference.

Petitioners are husband and wife who, at the time the petition was filed, resided in Sanibel, Florida.  Petitioners made joint returns of income for their taxable (calendar) years 1992 and 1993.  Petitioner Sandra A. Gales is a party herein by

_____

[1]  In the petition, petitioners state that they cannot recall whether the period for assessment and collection of taxes for 1992 had been validly extended to include the date of respondent's notice of a deficiency for 1992.  If not, petitioners raise an affirmative defense based on the expiration of the period for assessment and collection of the tax for 1992. See sec. 6501(a).  The parties have since stipulated that the notice of deficiency for 1992 was timely.  Therefore, we assume that petitioners are not pursuing their affirmative defense, and we do not further consider it.

virtue of having made joint returns with her husband.  Hereafter, we shall use the term "petitioner", in the singular, to refer only to petitioner James J. Gales.

Petitioner's Engagement by International Marketing Agencies, Inc.

During 1992 and 1993, petitioner was engaged as a national marketing director by International Marketing Agencies, Inc. (IMA), an insurance broker that sold health insurance to small businesses.  Petitioner was responsible for IMA sales for the territory west of the Mississippi River.  He would recruit agents to sell insurance in various territories he established.  As well as selling insurance directly and receiving commissions from those sales, petitioner received an "override commission" on insurance sold by agents he recruited.

Petitioner's Agreement With IMA

Petitioner's engagement by IMA was governed by an agreement entered into between petitioner and IMA on February 15, 1989.  As subsequently modified, that agreement (the agreement) was in effect in 1992 and 1993.  The agreement provides that petitioner, as an independent contractor, is engaged for the purpose of soliciting and obtaining applications for insurance offered by insurance companies represented by IMA.  Among the terms and conditions of the agreement are the following:

COMMISSIONS WHILE UNDER CONTRACT

1)    You [petitioner] will earn commissions, in
      the amount shown on the last page of this
      contract, on policies or certificates written
      by you as premiums are earned by the CO [the

insurance companies] and only upon payment to IMA in cash by the CO.

                *    *    *    *    *    *    *

3)   You understand and agree that advances are considered loans and are advanced against commissions to be earned.  As the commissions are actually earned on a month-to-month basis, they will be applied to offset the advance or loan.  At the end of each month, as provided in this contract, interest will be applied to the ending or debit balance. You agree that if the actual earned commissions that you are entitled to are not sufficient to retire the debit balance, you will pay the debit balance upon demand.  If the debit balance is not retired by earned commissions, or directly by you upon demand, you understand that IMA may take whatever legal action is necessary to collect the debit balance.

4)   It is understood that any earned commission will be paid to you only after all debts due IMA or its affiliates are paid in full.  Such debts include the following:

a)   All advance commission;

b)   Any other amounts due IMA or its affiliates;

c)   Any amount due IMA or its affiliates from any person from which you received override commission;

d)   Interest on advance commission debit balance, or any other charges which result in a debit balance, will be calculated at 2.0% above the current prime rate, as determined by Citibank NY, calculated at the end of each month.  In no event will the interest exceed the maximum amount permissible under applicable law.

                *    *    *    *    *    *    *

VESTING OF YOUR COMMISSIONS AFTER TERMINATION

1)   Qualifying for vesting under this contract will begin after one (1) year of continuous and active service under this contract.  * * *

2)  If this contract should terminate after it has been in effect for one (1) vesting year, * * * commissions will be credited for the same number of years after termination as the number of full vesting years this contract has been in effect, except as provided below.  If this contract is in effect for a period of five (5) full vesting years, commissions will be credited for ten (10) years.  If this contract remains in effect for ten (10) full vesting years, the commissions will be vested for life.

3)  If you do not submit an acceptable application for a period of six (6) consecutive weeks without written permission from IMA, your vesting period will end at the time of the last accepted application before the six-week period.  If this contract was not terminated and you submit new acceptable applications after six weeks, the time period for vesting purposes begins new at the date you submit your first acceptable application after the six-week period.

4)  If this contract is terminated for any reason and you are reinstated or a new contract is executed, a new vesting period will begin under the above terms after the reinstatement or new contract is executed.  Credit will not be given for previous time accumulated under a terminated contract or before reinstatement.

5)  You will forfeit all vesting of commission if you violate the provisions of this contract concerning competing with IMA in the health and life insurance business during or after termination of this contract.

6)  No renewal commission is payable if such renewal commission is less than $100.00 in any one month. After such time there will be no additional commission payable and no further statement of account will be furnished.

ADVANCE COMMISSION

IMA will provide an advance commission on business written by you under the following terms and conditions:

1)  You shall devote your full time and be exclusively contracted with IMA, and you are to be appointed only with the CO represented by IMA.

2)  The amount of the advance will be determined by IMA and may be modified, at the option of IMA, at any time.

3)  You understand that IMA/CO shall have the right to reject applications for insurance without specifying cause.  IMA has the right to determine the applications on which an advance commission will be paid.

         *    *    *    *    *    *    *

INDEBTEDNESS

1)  Any and all cash advanced to you by IMA shall, in the absence of any agreement in writing to the contrary, be loans payable upon demand.  As security for any such loans, IMA shall have a first lien upon any compensation payable to you under this or any other contract between you and IMA, and IMA may, at any time, deduct from any commissions or other amounts payable to you any debt or debts owed by you to IMA or its affiliates. You will also be held responsible for indebtedness incurred by anyone on whom you receive override commissions.

2)  After termination of this contract, you agree to grant IMA a first lien security interest in and on all amounts payable to you by any other company or organization to secure payment of any indebtedness you have outstanding to IMA at the time of your termination.  You agree that such security interest shall attach upon IMA giving the company or organization written notice of the lien and the amount of the lien.

         *    *    *    *    *    *    *

LIMITATIONS AND RESTRICTIONS

         *    *    *    *    *    *    *

8)  If the CO ceases to pay, or does not provide, funds for any reason to IMA or the affiliates, for the commissions or advances due IMA or affiliates from premiums of insurance written by you or from

which you receive override, then no commissions or advances will be due you under this contract. IMA is responsible for payment of earned commissions only if such commissions are paid to IMA in cash by the CO.

*   *   *   *   *   *   *

18) You understand and agree that if you fail to comply with any or all of the terms of this contract, you shall forfeit forever any commission that would otherwise be due under the contract, whether vested or not.

*   *   *   *   *   *   *

STATEMENT OF ACCOUNT

IMA will each month, or at other reasonable intervals, furnish you with a statement of your account and remittance for any amount due. Upon receipt of such account or remittance, you shall notify IMA in writing of any corrections or irregularities within ten (10) days of the date you receive such statement and/or remittance, or the statement shall be deemed correct, and rights to change any accounting shall be waived.

The agreement also contains a schedule of commission percentages, setting forth the percentages of premiums earned by petitioner for the initial year and for renewal years of policies sold by him. The agreement provides that it is to be construed pursuant to the laws of the State of Texas.

Payments Received From IMA

During 1992 and 1993, petitioner received payments from IMA in the amounts of $222,304 and $319,765, respectively (the 1992 and 1993 payments). IMA reported the 1992 and 1993 payments to both respondent and petitioner as nonemployee compensation on Forms 1099-MISC, Miscellaneous Income (the Forms 1099). Petitioners reported the 1992 and 1993 payments as gross receipts

on Schedules C, Profit or Loss From Business, to their 1992 and 1993 Forms 1040, U.S. Individual Income Tax Returns.  Petitioners showed as an offsetting expense (and deducted) on those Schedules C for 1992 and 1993 the amounts of $119,488 and $202,404, respectively (the 1992 and 1993 reported loan amounts). Petitioners, thus, reported nonemployee compensation received from IMA for 1992 and 1993 in the amounts of $102,816 and $117,361, respectively (the 1992 and 1993 reported compensation).

Petitioner's Calculations

Petitioner calculated the 1992 and 1993 reported loan amounts and the 1992 and 1993 reported compensation from the Forms 1099 and statements received from IMA of commissions earned for each of 1992 and 1993 (the IMA statements).  For each year, petitioner subtracted the amount shown on the pertinent IMA statement from the year's payments (the 1992 and 1993 payments, respectively), the difference being the year's reported loan amounts (1992 and 1993 reported loan amounts, respectively).  On the returns, petitioners subtracted the 1992 and 1993 reported loan amounts from the 1992 and 1993 payments, which resulted in the 1992 and 1993 reported compensation.

Respondent's Adjustments

Respondent disallowed petitioners' deductions for the 1992 and 1993 reported loan amounts.

Method of Accounting

Petitioner computed taxable income resulting from his engagement by IMA under the cash receipts and disbursements method of accounting.

Petitioner's Payments

On occasion, when called upon to do so by IMA, petitioner repaid to IMA a portion of the amounts advanced to petitioner under the agreement.

Termination of Petitioner's Engagement by IMA

Petitioner's engagement by IMA was terminated by letters from IMA dated March 31 and May 1, 1995 (the March 31 and May 1 letters, respectively). Among other things, the March 31 letter reminded petitioner of his responsibility for any balance on his agent statement. In pertinent part, the May 1 letter states:

> As of your last statement(s) produced, summaries of which are attached, your account is shown to have an advanced debit balance in the amount of $521,628.69, upon which the company has a first lien and security interest. Pursuant to your Contract [the agreement], this indebtedness is due in full upon demand by IMA. However, demand will not be made until this indebtedness exceeds the amount of your projected earned commissions for the next six (6) months, as determined solely by IMA. Your debit account will increase by assessment of uncollected charge backs, applicable lapses, and debit balance interest charges and/or any other IMA related debts incurred during that period of time. Your debit balance will be reduced by your total earnings for the next six (6) months (or longer for your contract's vesting term, if applicable). However, if you would like to avoid any additional interest charges, we will accept payment in full at this time. Please send your check to the address shown on this letterhead, to the attention of: Agent Accounting.

OPINION

I.  Advance Commissions

A.  Introduction

During 1992 and 1993, petitioner James J. Gales (petitioner) was engaged as national marketing director by International Marketing Agencies, Inc. (IMA).  IMA sold insurance as the agent of certain insurance companies.  Petitioner both supervised the sale of insurance by others and sold insurance himself. Petitioner's engagement by IMA was governed by an agreement (the agreement) that provided, among other things, for the payment to petitioner of commissions in advance of his earning those commissions under the agreement.  IMA reported all payments made to petitioner during 1992 and 1993 (the 1992 and 1993 payments, respectively) as miscellaneous income.  Petitioners reported those amounts on their 1992 and 1993 returns but deducted amounts in excess of amounts stated by IMA to have been earned during each of those years.  We must determine whether the amounts deducted, "advance commissions" (advance commissions), constitute gross income.  Petitioner argues that advance commissions were amounts lent by IMA to petitioner.

Petitioners bear the burden of proof, Rule 142(a), which they must carry by a preponderance of the evidence; e.g., UFE, Inc. v. Commissioner, 92 T.C. 1314, 1321 (1989).

B. <u>Discussion</u>

1. <u>Arguments of the Parties</u>

Respondent argues that petitioners have failed to establish the amount of advance commissions received by petitioner. Alternatively, respondent argues that the possibility that petitioner would ever have to repay any advance commissions was so remote that it must be disregarded, so that, in effect, petitioner had no liability for repayment of advance commissions, and the advance commissions were an item of gross income in the nature of compensation for services. Petitioner argues that, in form and substance, the advance commissions were loans and should be treated as such for Federal income tax purposes.

2. <u>Substantiation</u>

The agreement provides for advance commissions, and the March 31 and May 1 letters (terminating petitioner's engagement by IMA) are ample evidence of IMA's practice of paying advance commissions. Petitioner testified that he determined the amount of advance commissions for 1992 and 1993 (referred to in our findings of fact as "the 1992 and 1993 reported loan amounts") by subtracting from the 1992 and 1993 payments the amounts appearing on statements received from IMA showing commissions earned for 1992 and 1993 (earned commissions). The parties agree as to the amounts of the 1992 and 1993 payments. The IMA statements are not in evidence, and the only evidence we have as to their existence and content is petitioner's testimony, as reflected in his tax returns. Respondent objects to petitioners' proposed

findings with respect to the IMA statements on the grounds that petitioner's testimony was self-serving and uncorroborated. That is true, but it does not necessarily mean that petitioner's testimony was false or unpersuasive. Petitioner was a credible witness, and his unrebutted testimony is sufficient to carry his burden of proving advance commissions for 1992 and 1993 of $119,488 and $202,404, respectively, and we so find.

     3.  Liability

Gross income includes compensation for services, including commissions on insurance premiums and compensation for services to be performed in the future. Beaver v. Commissioner, 55 T.C. 85, 91 (1970) (future services). Sec. 61(a)(1); sec. 1.61-2(a)(1), Income Tax Regs. (specific reference to commissions on insurance premiums). An amount received by a taxpayer as a loan, however, does not constitute an item of gross income because of the obligation of the taxpayer to repay the amount received. See James v. United States, 366 U.S. 213, 219 (1961).

Pursuant to the agreement, petitioner earned a commission on insurance sold by him or by others working under his supervision. Petitioner's commissions were a percentage of the premiums paid on the insurance sold by him or by those others. Petitioner earned a commission only as the insurance company writing the insurance earned a premium and IMA received payment from that company. IMA had discretion to pay advance commissions on insurance written by petitioner. At the time those advance commissions were paid, the insurance had already been written

and, we assume, petitioner and those under his supervision had performed all (or the bulk) of the services required of them for petitioner to earn a commission. The advance commissions were, thus, not paid for future services. They were paid with respect to past services for which compensation was not yet due (i.e., had not yet been "earned") under the agreement.

The advance commissions were described as "loans payable on demand" in the agreement, and interest accrued on any balance of advance commissions. Petitioner's obligation to repay the advance commissions was secured by, among other things, compensation payable under the agreement (i.e., earned commissions). If IMA's sole recourse for repayment of the advance commissions were earned commissions, we would have no difficulty concluding that the advance commissions were compensation for services, includable in gross income. In George Blood Enters., Inc. v. Commissioner, T.C. Memo. 1976-102, we stated:

> Advances of commissions to a taxpayer under an agreement that places no personal liability of repayment on him but provides that any excess of the advances over commissions earned are to be recovered by the payor only by crediting earned commission against the advances constitute income to the recipient when the advances are received. L.L. Moorman [v. Commissioner], 26 T.C. 666, 674 (1956); Kenneth Drummond [v. Commissioner], 43 B.T.A. 529, 532--533 (1941). * * *

Recently, in Dennis v. Commissioner, T.C. Memo. 1997-275, we determined that an insurance agent was personally liable for the repayment of advance commissions notwithstanding that such

repayment was secured by future earned commissions; we found that the advance commissions were loans, whose receipt was not an item of gross income.

The agreement provides that it is to be construed pursuant to the laws of the State of Texas and that repayment of advance commissions is to be on demand. Petitioner's obligation to repay the advance commissions is secured by earned commissions, but respondent has provided no authority that, under Texas law, IMA's recourse upon a default by petitioner was limited to earned commissions. Indeed, respondent appears to concede petitioner's personal liability to repay the advance commissions: "Respondent submits that, in the instant case, there was never any current personal liability of petitioner. The personal liability was merely contingent and arose only in the event the earned commissions did not cover the advanced commissions and this was unlikely to occur." (Emphasis added.) Respondent's argument is not based on the absence of personal liability as a matter of law, but on the likelihood that petitioner's earned commissions would always be adequate to cover his advance commissions and payment would never be demanded of him. In fact, petitioner testified that, on occasion, repayment was demanded of him and he repaid some of the advance commissions. We believe petitioner, and we have found accordingly. In the May 1 letter (terminating petitioner's engagement by IMA), reference is made to reducing petitioner's debit balance to IMA by his earnings for the vesting term of the agreement "if applicable". The vesting provisions in

the agreement limit petitioner's right to commissions on renewal premiums. If petitioner's right to commissions on renewal premiums were not vested, and earned commissions were not sufficient to liquidate his debit balance (of advance commissions), nothing in the agreement prevents IMA from demanding payment of that balance.

Respondent also relies on the stipulated testimony of Max Heinz, director of operations of IMA. Mr. Heinz' stipulated testimony is as follows:

> That his name is Max Heinz and that he is employed by International Marketing Agencies, Inc. His position with the company is Director of Operations. He is familiar with the issue presented in this case as to whether "advances" made to the agents of IMA were non taxable loans or were taxable compensation and income. He states that the company takes the position that the advances are to be treated as taxable compensation income at the time the advances are made, and the company files formed [sic] 1099 consistent with that position.

> He also states that the company has in the past advised agents when they leave employment with the company that the company expects that the advances be repaid to the company out of future insurance renewal's [sic] and that if those renewal's [sic] are insufficient to make such payment then the advances will be deemed a liability of the employee. The company typically sends out a letter reminding the employee of the obligation, but generally does not proceed further with the legal process to collect the debt.

We are unpersuaded by that testimony. First, it fails to explain the striking inconsistency between the terms of the agreement (advance commissions are "loans payable on demand") and IMA's practice of treating advance commissions as reportable income. Second, we are unable to make much of Mr. Heinz' contradictory

statements that "advances will be deemed a liability of the [departing] employee" but "generally IMA does not proceed further with legal process to collect the debt." We assume that Mr. Heinz had in mind IMA's tax reporting position when he made the statements stipulated. Those statements alone are insufficient to persuade us that the advance commissions were not intended to be loans.

C. Conclusion

Petitioner received advance commissions under an obligation to repay them on demand. IMA's recourse on default was not limited to earned commissions. The advance commissions were loans and, as such, not items of gross income.

II. Innocent Spouse Claim

Petitioners failed to produce any evidence supporting their claim that petitioner Sandra A. Gales should be relieved of liability as a so-called innocent spouse. Petitioners also failed to address that claim on brief. Therefore, we conclude that petitioners have abandoned that claim and we do not further address it. See Bernstein v. Commissioner, 22 T.C. 1146, 1152 (1954) (holding against the taxpayer with respect to an issue because, among other things, the taxpayer did not press the issue on brief), affd. per curiam 230 F.2d 603 (2d Cir. 1956); Lime Cola Co. v. Commissioner, 22 T.C. 593, 606 (1954) ("Petitioners in their brief do not argue anything about * * * [the issue]; and, although they do not expressly abandon the issue * * * we presume they no longer press it.").

III.  <u>Conclusion</u>

Respondent's adjustment disallowing the deductions of the 1992 and 1993 reported loan amounts was in error.  Respondent's determinations of deficiencies are not sustained to the extent allocable to those adjustments.

<u>Decision will be entered</u>

<u>under Rule 155</u>.