T.C. Memo. 2010-287

UNITED STATES TAX COURT

MICHAEL C. WINTER AND LAUREN WINTER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5035-05.                  Filed December 30, 2010.

<u>John B. Beery</u>, <u>Joseph M. Laub</u>, and <u>John J. Scharkey III</u>, for
petitioners.

<u>Kathleen C. Schlenzig</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Michael Winter owned stock in the bank where
he worked.  The bank paid him a large bonus in 2002, but then
fired him and demanded part of the bonus back.  On his 2002
return, Winter reported the full amount of his bonus, and his
share of the bank's income and deductions--not as those items
were reported by the bank, but from his own estimates.

The parties argued mostly about the consequences of Winter's failure to report his income from the bank consistently with its return, and about the taxability of his bonus in the year he received it.  I would have held that the Court lacks jurisdiction over these questions, but my colleagues, in a reviewed opinion, assured me, the parties, and the rest of the audience for our opinions that we did have jurisdiction in Winter v. Commissioner, 135 T.C. ___ (2010) (Winter I).  Retreating back into my role as the trial judge in the case, and resuming our customary habit of using the first person plural, we now decide all the remaining issues in the case.  Winter I laid out the facts in detail and we assume familiarity with them.

The key fact was that Winter failed to report his income from Builders Financial Corporation (BFC) consistently with the Schedule K-1, Shareholder's Share of Income, Credits, Deductions, that BFC prepared for him.  Winter claims he never got the K-1, and instead used BFC's published regulatory statements to calculate his passthrough income.  Using these numbers, Winter calculated his share of BFC's income to be a $1.2 million loss instead of the $820,031 gain BFC reported.  Winter faults BFC's tax return for deducting only a portion of his prepaid bonus in 2002.  The Commissioner also asserted that Winter failed to

report some dividend, interest, and gambling income. Winter has since conceded those adjustments.[1]

Yet another dispute arises from an issue not even mentioned in the notice of deficiency--the taxability of the bonus payment. Winter doesn't deny he received a W-2 showing 2002 compensation of $5,623,559, and he did report this entire amount on his return. But now he claims that he didn't have to. Finally, the Commissioner questions the deductibility of Winter's pro-rata share of BFC's charitable contributions and says Winter should pay an accuracy-related penalty. There are thus four substantive issues:

- How should Winter have reported his proportionate share of BFC's income or loss (and did BFC report the amount correctly);

- Was the unearned portion of his bonus income in 2002;

- Can he take a charitable-contribution deduction for his share of BFC's donations; and

- Is he liable for an accuracy-related penalty?

_____

[1] Winter expressly conceded $12,111 in dividend and gambling income, but the notice of deficiency also included an adjustment for $178 in unreported interest income that isn't specifically addressed by either party. Though Winter disputed the "entire amount of the deficiency" in his petition, he didn't pursue this issue on brief and we therefore deem it conceded. See Rule 151(e)(4) and (5); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989). (This Rule reference, like all Rule references in this opinion, is to the Tax Court Rules of Practice and Procedure. All section references are to the Internal Revenue Code unless otherwise noted.)

Winter was a resident of Illinois when he filed his petition, and the parties submitted the case for decision under Rule 122.

## Discussion

### I. Winter's Passthrough Income

Our first puzzle is whether it was wrong for Winter to report a passthrough loss on his return instead of reporting the passthrough income shown on his K-1.[2] One large difference between Winter's and BFC's reporting--and the only one the parties focus on here--is the treatment of the $5.1 million prepayment of Winter's five-year, $5.5 million bonus that BFC made in 2002. Because BFC is a passthrough corporation, deciding how it should have treated the bonus will tell us how Winter should have reported it.

The major disputes are about the payment's proper characterization and the timing of its deduction. No one disputes that BFC properly deducted about $1.1 million of the

---

[2] S corporations used to be subject to TEFRA, the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, one part of which governs the tax treatment and audit procedures for most partnerships, TEFRA secs. 401-406, 96 Stat. 648. In an effort to promote consistent reporting among shareholders, TEFRA originally required taxpayers to challenge S corporations' taxes in a single, corporation-level proceeding. In 1996, however, Congress repealed this part of TEFRA, Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1307(c)(1), 110 Stat. 1781, and shareholders like Winter may now challenge their S corporation's tax return in individual proceedings like this one.

bonus in 2002--the portion that Winter earned that year.  See sec. 162(a)(1); sec. 1.162-9, Income Tax Regs.  But Winter claims BFC, as a cash-basis taxpayer, should also have deducted another $4 million, the part of the bonus that BFC prepaid.  Winter claims that BFC had authority to deduct this disputed portion in 2002 under either section 461(f), as a contested liability because the payment resembled severance, or under section 162 as an ordinary and necessary business expense.  The Commissioner disagrees.

A.   Does Section 461(f) Apply?[3]

Unless the Code explicitly allows a taxpayer to make an election, each of his expenses has a proper year for its deduction.  Crisp v. Commissioner, T.C. Memo. 1989-668 ("It is intrinsic to our system of annual accounting that each item of income and expense has a singular, correct treatment under a taxpayer's chosen method of accounting"); see also sec. 1.263(a)-3(b), Income Tax Regs. (listing Code sections that allow a taxpayer to elect timing of certain deductions).  Section 461(a) states the general rule--a deduction is to be taken in the "proper taxable year under the method of accounting used in computing taxable income"--and the remaining subsections create

---

[3] Section 461(f) applies to both cash-basis and accrual-method taxpayers.  Barnette v. Commissioner, T.C. Memo. 1992-371 (citing Weber v. Commissioner, 70 T.C. 52, 55 n.4 (1978)), affd. 41 F.3d 667 (11th Cir. 1994).

various exceptions or qualifications.  So we know at the outset that if any of the latter subsections applies, its specific rule will trump section 461(a)'s general one.  See <u>Pilaria v. Commissioner</u>, T.C. Memo. 2002-230 (citing <u>Bulova Watch Co. v. United States</u>, 365 U.S. 753, 758 (1961)).

One of the exceptions is section 461(f), which applies to "contested liabilities."  The Commissioner's main argument on this issue is that Winter's prepaid bonus wasn't contested, and therefore section 461(f) doesn't apply.  So we must first decide if the disputed portion of the bonus was "contested".  If it was, we have to follow section 461(f)'s timing rules.  If not, we have to revert to section 461(a) and analyze the timing of the deduction under BFC's accounting method.

The Code doesn't say when we should look to see if a contest exists, but the Commissioner argues the right time to look to see if a contest exists is the time when the payment was made. Because BFC paid Winter when both parties were happy with each other, the Commissioner argues, there was no "contested liability" under section 461(f).  Without more, this would be a plausible reading of the statute, but an example in the regulation points in exactly the opposite direction:

> <u>Example</u>: * * * O [Corporation] receives a large shipment of typewriter ribbons from S Company on January 30, 1964, which O pays for in full on February 10, 1964.  Subsequent to their receipt, several of the ribbons prove defective because of inferior materials used by the manufacturer.  On August 9, 1964, O orally

notifies S and demands refund of the full purchase price of the ribbons. After negotiations prove futile and a written demand is rejected by S, O institutes an action for the full purchase price. For purposes of paragraph (a)(1)(i) of this section, S has asserted a liability against O which O contests on August 9, 1964. O deducts the contested amount for 1964.

Sec. 1.461-2(b)(3), Income Tax Regs. This example forces us to reject the Commissioner's contention that the contest had to exist when BFC paid Winter. We think instead that it makes more sense to look at whether a contest existed at the end of the tax year. We infer this from the regulation, which says a contest under section 461(f) means "[a]ny contest which would prevent accrual of a liability under section 461(a)." Sec. 1.461-2(b)(2), Income Tax Regs. If a liability isn't contested at the end of the tax year, then the taxpayer can use the ordinary deduction-timing rules of section 461(a); if it is, he cannot.

The relevant regulations also say there is a contest when "there is a bona fide dispute as to the proper evaluation of the law or the facts necessary to determine the existence or correctness of the amount of an asserted liability." Sec. 1.461-2(b)(2), Income Tax Regs. Although beginning a lawsuit is sufficient to establish a contest, it isn't necessary--an affirmative act denying the validity of the liability is sufficient. Id. It isn't even necessary that the objection be in writing. Id. Although BFC didn't sue Winter until 2003, we find that BFC's November 2002 "Notice of Termination for Cause"

suffices to mark the start of a "contest". As in the regulation's example, BFC paid without complaint but later decided to demand partial repayment. From the example we know a contest begins on the date the payor notifies the payee of its discontent. BFC's letter was sent in November 2002, before the close of the tax year. We also find that BFC's later demand for repayment sent in January 2003 proves that the contest continued to exist at the end of the 2002 tax year. We therefore must look to section 461(f).

B.   Contested Liabilities

Section 461(f) allows a deduction for a contested liability in the year paid if the following conditions are met:

> (1) the taxpayer contests an asserted liability,
>
> (2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability,
>
> (3) the contest with respect to the asserted liability exists after the time of the transfer, and
>
> (4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer * * * determined after application of subsection (h) * * *

The Commissioner argues that not one of these elements is met. He says that because BFC paid Winter voluntarily and did not contest the amount at the time of the payment, BFC did not contest an asserted liability or transfer money to provide for the satisfaction of the asserted liability. He even reads the

third element to say the contest had to exist at the time BFC made the payment. The Commissioner finally says the deduction fails the fourth element because the deduction doesn't pass the economic-performance test of subsection (h). We'll look at the elements in order.

### 1. Taypayer Contests an Asserted Liability

The first element requires us to decide if there was a contest and if there was an asserted liability. We've already found that a contest did exist, and turn immediately to figure out if there was an asserted liability.

An asserted liability under section 461(f) is "an item with respect to which, but for the existence of any contest in respect of such item, a deduction would be allowable *under an accrual method of accounting*." Sec. 1.461-2(b)(1), Income Tax Regs. (emphasis added). For these purposes, we assume the contest away--that is, we assume BFC fired Winter without cause and Winter gets to keep the money--and we pretend that BFC uses the accrual method of accounting. We then ask if, in those circumstances, BFC should have deducted the entire amount in 2002.

This brings us to an important characterization question (and one of the main disagreements): What did BFC actually pay for with the disputed portion of the bonus if BFC fired Winter without cause? Winter says the characterization of the payment

morphed when he got the boot--it was no longer a prepayment for future services but compensation for his early dismissal--a sort of severance or contract-termination payment. The Commissioner doesn't disagree that severance would be deductible, but instead argues that the payment's characterization didn't change from earlier in the year--that it was still for services to be rendered in the future. The Commissioner then reasons that BFC can't deduct the disputed portion in 2002 because Winter did not "actually render" the services for the disputed portion in that year. See sec. 162(a)(1). Winter argues that this reading forbids BFC from ever deducting the disputed portion because, after termination, he would no longer provide services under the contract. That would mean, he argues, that he would necessarily have performed all the services the contract required of him in 2002. If true, the payment would still be fully deductible.

We agree with Winter that, were it not for BFC's attempt to claw it back, the disputed portion of the bonus would be a separation payment or severance. We have said that severance is paid by an "employer as compensation for termination of the employer-employee relationship." Meehan v. Commissioner, 122 T.C. 396, 401 (2004). The employment agreement states that it was meant to memorialize, among other things, "the financial details relating to any decision that either Executive or Employer might ever make to terminate this Agreement" and section

4(c) of the employment agreement entitles Winter to receive the entire bonus if he is prematurely terminated without cause.[4]

The Commissioner counters that there's simply no basis for the recharacterization. We disagree. Circumstances surrounding a payment can change its character. See Swed Distrib. Co. v. Commissioner, 323 F.2d 480, 485 (5th Cir. 1963), affg. T.C. Memo. 1962-41. And according to the employment agreement, while Winter was employed he earned a right to the bonus on a daily basis as he provided services--the $1.1 million Winter earned that way was deducted without question. Liability for the disputed portion, however, arose from another clause of the employment agreement-- it's Winter's remedy for premature termination without cause. We therefore agree with Winter that his entitlement to the money (remember we're assuming the contest away) arose out of this provision of the contract and, in the absence of a contest, was separation pay similar to severance.[5]

---

[4] Winter does note that the unpaid portion of the bonus would not be deductible in 2002 if he had *not* been fired. We agree. BFC was a cash-basis taxpayer, see sec. 1.461-1(a)(1), Income Tax Regs., and could not have deducted the unearned portion because of section 1.461-4(g)(7), Income Tax Regs. (requiring economic performance), and possibly because BFC and Winter were related taxpayers. See sec. 267(a)(2).

[5] In the alternative, if BFC paid Winter for services (as the Commissioner contends), we also agree with Winter that he provided all the services required under the contract by the end of 2002, and economic performance therefore still occurred during that year. See sec. 461(h)(2)(A)(i). Winter is correct that the Commissioner's position would leave BFC with no other year in which to deduct the disputed portion. (The Commissioner denies
(continued...)

Severance is generally deductible in the year it's paid. See sec. 1.162-10(a), Income Tax Regs. (allowing a deduction for "[a]mounts paid or accrued within the taxable year for dismissal wages"); Moser v. Commissioner, T.C. Memo. 1989-142 ("It also is clear to us that the severance benefit * * * constituted 'dismissal wages' * * * contemplated under the regulation"), affd. 914 F.2d 1040 (8th Cir. 1990). But, returning to the first element of section 461(f), we must determine the proper year of deduction if BFC was an accrual-method taxpayer. Section 461(a) and an accompanying regulation answer this question--using the accrual method, items generally can't be deducted until all events that establish the existence of the liability have happened, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred. Sec.

---

[5](...continued)
this, but doesn't suggest any rationale to a deduction for the unearned portion of the bonus in any year other than 2002.)

It is possible, as the Commissioner suggests in a footnote to his final reply brief, that the bonus would stumble on the requirement that compensation be reasonable, if the entire bonus never lost its character as a payment for services. See sec. 1.162-9, Income Tax Regs. But raising new grounds for disallowance in a footnote in a reply brief is hardly sufficient notice to Winter to contest the issue. See, e.g., Tabrezi v. Commissioner, T.C. Memo. 2006-61 (finding the IRS could not win on a new matter raised in a posttrial brief without sufficient supporting evidence). We also note that the reasonableness determination must take into account the circumstances at the time the contract is made, rather than when it is questioned. Sec. 1.162-7(b)(3), Income Tax Regs. And the Commissioner doesn't challenge the reasonableness of Winter's compensation from the perspective of the time he began work, but only from the perspective of when BFC fired him.

1.461-1(a)(2)(i), Income Tax Regs.  This analysis is sometimes called the all-events test.  <u>Capital One Fin. Corp. v. Commissioner</u>, 133 T.C. 136, 196 (2009).

Assuming the dispute was resolved in Winter's favor, the first two prerequisites for deducting a liability in 2002 under the accrual method would be met--all events establishing BFC's liability would have happened, and BFC would owe Winter the entire bonus of $5.5 million.  But the Commissioner argues that the hypothetical runs afoul of the third requirement--he says economic performance for the disputed portion didn't occur in 2002 because Winter performed only one-fifth of the total services that year.

The Commissioner may be right if "the liability of the taxpayer arises out of * * * the providing of services to the taxpayer by another person," sec. 461(h)(2)(A)(i), in which case economic performance occurs as the services are provided.  But in the counterfactual world the regulation tells us to explore, BFC's liability didn't arise from Winter's actual work, but from BFC's premature termination of his employment.[6]  The statute

---

[6] Of course the employment agreement existed in the first place to govern Winter's employment by BFC, and so in a very broad sense the disputed portion could be construed as arising from the provision of services.  We don't read section 461(h) this way, however, particularly because regulations distinguishing claims--such as workers compensation--would be swallowed by such an expansive reading.  Sec. 1.461-4(g)(2), Income Tax Regs.  We avoid Justice Jackson's "winding trail of remote and multiple causations."  <u>Lykes v. United States</u>, 343

(continued...)

doesn't say when economic performance occurs for a severance payment, so we turn to the regulations.

The regulations set out several categories of claims and establish what constitutes economic performance for each. See sec. 1.461-4, Income Tax Regs. We don't think the applicable regulation is section 1.461-4(g)(2), Income Tax Regs., which covers liabilities arising from a breach of contract. If BFC made the payment to Winter in satisfaction of the contract, it wasn't in breach.[7] So we turn to section 1.461-4(g)'s catchall provision, which says economic performance occurs when payment is made to the creditor. Sec. 1.461-4(g)(7), Income Tax Regs. We therefore find that economic performance related to the disputed portion of the bonus occurred when BFC made the payment to Winter, and BFC would therefore be able to deduct the paid portion of the bonus in 2002 under the accrual method of accounting. This in turn means that the disputed portion was an "asserted liability" and the payment therefore meets the first element of section 461(f).

---

[6](...continued)
U.S. 118, 128 (1952) (Jackson, J., dissenting) (positing that looking too far back in a causal chain could lead one to suppose attorney's fees for effecting a gift actually sprang from the taxpayer's decision to have children because if the taxpayer didn't have children, there wouldn't have been a gift).

[7] Not that it would make a difference--the time for economic performance in the breach-of-contract regulation is the same. Sec. 1.461-4(g)(2), Income Tax Regs. ("economic performance occurs as payment is made to the person to which the liability is owed").

### 2. Taxpayer Transfers Money to Satisfy Asserted Liability

The Commissioner also asserts that Winter can't show he meets the second element of the test--a transfer of money to satisfy an asserted liability.  He does not argue, of course, that BFC didn't transfer money to Winter, but he does argue that it could not have been a transfer to satisfy an asserted liability because no liability was asserted at the time of transfer.  But remember the example we discussed above.  The taxpayer in that example had paid a bill without complaint, and only later disputed the quality of the merchandise and demanded a refund.  Sec. 1.461-2(b)(3), Income Tax Regs.  This example shows that section 461(f) can apply when the taxpayer seeks to recover money transferred before the dispute began.

The Commissioner also makes much of the fact that BFC paid Winter before it had to and says that that means there was no real liability at the time.  It's true that cash-basis taxpayers often can't deduct voluntarily prepaid business expenses because it's not ordinary and necessary in business to pay for things before one has to.  See sec. 162(a); <u>Bonaire Dev. Co. v. Commissioner</u>, 679 F.2d 159, 161 (9th Cir. 1982), affg. 76 T.C. 789 (1981).[8]  But "liability" in this context means "asserted

---

[8] The Ninth Circuit noted in <u>Bonaire Dev. Co. v. Commissioner</u>, 679 F.2d 159, 161 (9th Cir. 1982), affg. 76 T.C. 789 (1981), that there are "two principal exceptions" to the general rule that a cash-basis taxpayer can't deduct a prepaid
(continued...)

liability," and we have already found that BFC's bonus expense was an asserted liability within the regulation's definition of that term.  See sec. 1.461-2(b)(1), Income Tax Regs.

### 3.   Contest Exists After the Time of the Transfer

The third element is easily met.  The plain language of the statute says that the contest must exist *after* the time of the transfer.  The regulations clarify that for a contest to exist after a transfer, "such contest must be pursued subsequent to such time.  Thus, the contest must have been neither settled nor abandoned at the time of the transfer."  Sec. 1.461-2(d), Income Tax Regs.  The contest had not even begun at the time BFC paid Winter, so it's clear that the payment didn't settle the dispute.  And BFC pursued the contest in late 2002 and into 2003, showing that its claim wasn't abandoned at the end of 2002.  We therefore find Winter satisfies this element.

---

[8](...continued)
expense in the year paid.  One of those exceptions is when an entity has a compelling business reason for prepaying.  Id. at 162.  The record here establishes that the bonus was prepaid to help Winter with a tax bill that arose from his exercise of the stock options that made him more than a quarter-owner of BFC. BFC's desire to have its chief executive officer own a significant chunk of its equity may qualify as a compelling business reason, though we don't need to decide the issue.

## 4. But for the Contest, a Deduction Would Be Allowed After Application of Subsection (h)

Section 461(f)(4) requires that the contested payment would otherwise be deductible after application of subsection (h). Subsection (h) says a liability is not incurred until the time "when economic performance with respect to such item occurs."[9] We have already found that economic performance occurred when BFC paid Winter. See *supra* pt. I.B.1. This brings us to the last requirement, that "[t]he existence of the contest with respect to an asserted liability must prevent (without regard to section 461(f)) and be the only factor preventing a deduction for the taxable year of the transfer." Sec. 1.461-2(e)(1), Income Tax Regs.

So we now have to consider a different hypothetical--if there wasn't a contest (and Winter was able to keep the entire bonus), would BFC be able to deduct the disputed portion in 2002 as a cash-basis taxpayer? We already determined that the payment in this hypothetical would be for severance, and that severance is a deductible expense, but we must look again at timing.

Once correctly stated, the question is easy to answer. A cash-basis taxpayer has to deduct the payment in the year it makes the payment. Secs. 1.446-1(c)(1)(i), 1.461-1(a)(1), Income

---

[9] The statute allows for exceptions "provided in regulations prescribed by the Secretary," sec. 461(h)(2), but Winter doesn't bring any relevant exceptions to our attention, nor can we find any.

Tax Regs.  There are of course some limits as to which expenses can be deducted currently (ordinary expenses) and which have to be capitalized (capital expenditures).[10]  See <u>Wells Fargo & Co. & Subs. v. Commissioner</u>, 224 F.3d 874, 880 (8th Cir. 2000) (citing <u>Commissioner v. Tellier</u>, 383 U.S. 687, 689-90 (1966)), affg. in part & revg. in part <u>Norwest Corp. & Subs. v. Commissioner</u>, 112 T.C. 89 (1999).  An expenditure must be capitalized, and not deducted, if it creates an asset with a useful life extending "substantially beyond the close of the taxable year."  Sec. 1.461-1(a)(1), Income Tax Regs.  These rules embody the general goal of the timing rules--"to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes."  <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).

Severance is, as a general rule, immediately deductible. Rev. Rul. 94-77, 1994-2 C.B. 19, 20 ("The <u>INDOPCO</u> decision does not affect the treatment of severance payments, made by a taxpayer to its employees, as business expenses which are generally deductible under § 162 and § 1.162-10").  But we must

---

[10] Capitalization lets a taxpayer recover the costs of a separate asset whose life extends beyond a single tax year.  In the case of an intangible asset, such as prepaid compensation, a taxpayer should create an asset on his books and deduct a portion of the cost each year over the life of the related asset.  This process smoothes out his income stream and more appropriately matches expenses to the related income.  See <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).

also ask if the payment of the disputed portion of the bonus created an asset with a useful life extending "substantially beyond the close of the taxable year." Sec. 1.461-1(a)(1), Income Tax Regs. If Winter remained employed by BFC, the prepayment would serve BFC in the production of income for several years, and the Commissioner is correct that BFC would be required to create an intangible asset to amortize over the life of the contract. See Wildman v. Commissioner, 78 T.C. 943, 962 (1982). But when BFC fired Winter, it forfeited any future benefit it might have otherwise received. Because Winter would no longer work for BFC, the payment had no remaining value to the bank and became an immediate loss.[11] We therefore find that, but for the contest, BFC could have deducted the disputed portion in 2002 as a cash-basis taxpayer. Overall, then, the disputed

---

[11] It's possible that the employment agreement would benefit BFC beyond 2002 via two restrictive covenants--a confidentiality and loyalty clause, and a one-year covenant not to compete following Winter's termination. See, e.g., Becker v. Commissioner, T.C. Memo. 2006-264. But it's not clear from the contract what portion, if any, of Winter's compensation was in consideration for these covenants, or if the covenants offer more than an incidental benefit. See INDOPCO, 503 U.S. at 87 ("[T]he mere presence of an incidental future benefit--'*some* future aspect'--may not warrant capitalization"). Both parties implicitly value them at zero. The Commissioner argues that BFC properly deducted the first $1.1 million in 2002 because Winter had provided one-fifth of the total services--this can only be true if none of the $5.5 million is allocated to the covenants. Winter also ignores the covenants by arguing that the full payment should be deducted in 2002 as part compensation and part severance. This isn't a jurisdictional argument, so we won't make an argument for the parties that they do not make for themselves.

portion satisfies all four elements of section 461(f), and we hold that the entire $5.1 million was deductible by BFC in 2002.[12]

## II.  Taxability of the Bonus to Winter in 2002

Winter was not only a shareholder of BFC but also an employee.  When he filed his 2002 return, he reported his entire prepaid bonus as taxable employee income, which was consistent with the W-2 which BFC sent to him.  But Winter now claims only a portion of the bonus should be taxable in 2002 either because it was really a loan and not income; or, if it was income, he did not have unrestricted access to it and so should not be taxed on it until some later year.

### A.  Was the Bonus Payment a Loan to Winter?

Winter claims that the unearned portion of his bonus should not be included in his 2002 gross income because it was a loan.  Both parties agree that loan proceeds are generally not included in the borrower's gross income.

> When a taxpayer receives a loan, he incurs an
> obligation to repay that loan at some future

---

[12] This deduction, however, seems to resolve about half of the inconsistent-reporting discrepancy.  Winter and the bank were about $2 million apart on their estimates of his 2002 passthrough income.  Resolving the disputed portion of the bonus payment appears to account for about $1 million of the difference (the $4 million disputed deduction times Winter's share of 26 percent, plus any computational adjustments that may follow).  Winter, however, doesn't challenge any other items on BFC's return--and without a challenge, their treatment on BFC's tax return is binding on him.  See Rule 151(e)(4) and (5); Petzoldt, 92 T.C. at 683.

> date. Because of this obligation, the loan
> proceeds do not qualify as income to the
> taxpayer.  When he fulfills the obligation,
> the repayment of the loan likewise has no
> effect on his tax liability.

Commissioner v. Tufts, 461 U.S. 300, 307 (1983).  Winter points out that, under certain circumstances outlined in his employment contract, he would be required to repay some of the 2002 bonus.  This potential repayment obligation, he claims, makes the unearned portion of the bonus a loan.

The Commissioner argues that Winter must include the entire bonus paid in his income because it was not a loan but a payment for personal services subject to a conditional obligation to repay.  See, e.g., Haag v. Commissioner, 88 T.C. 604, 615-16 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988).  And, even though we found the disputed portion to be severance, that would likewise be includable in Winter's 2002 income if it isn't a loan.  See Putchat v. Commissioner, 52 T.C. 470, 475-77 (1969), affd. 425 F.2d 737 (3d Cir. 1970); sec. 1.61-2(a)(1), Income Tax Regs.

Winter argues that his case is like Dennis v. Commissioner, T.C. Memo. 1997-275, and Gales v. Commissioner, T.C. Memo. 1999-27.  In Dennis, the taxpayer was an insurance agent who received advance sales commissions.  Under his employment contract, Dennis could take a monthly draw against future commission income.  He was personally liable for the advances, which were payable to the employer on demand.  Although he had complete control over the

money he received, he didn't include any of it in his income for tax purposes. The employer kept records of all advances and charged Dennis an administrative fee each month. We found that Dennis had a *bona fide* obligation to make repayments and classified his advance commission as loans not includable in his gross income.

Gales also was an insurance sales agent whose employer had advanced him commissions. These payments accrued interest, and their repayment was secured by Gales's future compensation. We found that they were loans and not income, because Gales was personally obligated to repay them. Pointing to Dennis and Gales, Winter argues that the proper test is whether he had a *bona fide* personal obligation to repay the bonus advance. Winter says that if the bank had won or settled its employment contract case against him, including its claim that it properly terminated him for cause, he would then have had an unconditional personal obligation to repay all or part of his unearned bonus.

The Commissioner disagrees. He argues that in both Dennis and Gales the employers charged the taxpayers interest on the advances and placed no conditions on the taxpayers' obligation to repay. The Commissioner says that Winter's case is more like McCormack v. Commissioner, T.C. Memo. 1987-11, where the taxpayer received a salary advance. He and his employer had an understanding that if he didn't work for the contracted time, he would have to repay the unearned portion of the advance. We relied on

the absence of a note evidencing indebtedness and the lack of any interest charged on the debt to characterize the payment as income. Most importantly, the primary purpose of the McCormack arrangement was the provision of personal services and not the lending of money.

The Commissioner's analogy is closer. Winter's primary obligation under his employment contract was, just like McCormack's, to work--not to repay a loan secured by future income. And just like the employer in McCormack, BFC did not require Winter to sign a note or pay interest on the bonus advance.

Winter also only partially states the correct test. We said in Dennis that "whether or not such advances constitute income depends on whether, at the time of the making of the payment, the recipient had unfettered use of the funds and whether there was a bona fide obligation on the part of the agent to make repayment." Dennis, T.C. Memo. 1997-275 (emphasis added); see also Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203, 211-12 (1990). The key question is thus whether Winter's obligation to repay the bonus was unconditional at the time he received it. And we answer that it was not--he'd have to repay if and only if he quit or was fired for cause within five years. Whether he was able to last that long doesn't affect the underlying character of the bonus as compensation when he

received it, and its change from compensation for services to compensation for early dismissal doesn't matter either.

   B. Should Winter Include the Entire Bonus Payment in His 2002 Income?

Now that we have decided the character of the bonus payment (it's income, not a loan), we must decide the timing of its recognition. The Commissioner argues that the bonus was paid to Winter in 2002 and so it's taxable to him in 2002. We agree. A taxpayer's receipt of money which would otherwise qualify as taxable income is taxable even though there is a possibility he'll have to return the money later. Hamlett v. Commissioner, T.C. Memo. 2004-78; see also N. Am. Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932). A taxpayer cannot postpone paying tax on a disputed amount until the dispute is finally settled. See United States v. Lewis, 340 U.S. 590, 592 (1951). Section 451(a) provides the general rule that a taxpayer must report items of gross income in the year he receives them. Under section 1.451-1(a), Income Tax Regs., taxpayers like Winter who use the cash method of accounting must include such items in gross income when actually or constructively received. The Code mitigates the potential harshness of this rule to a taxpayer who's later forced to repay the income by giving him a deduction--but only in the year he repays it. Secs. 162, 1341; Pahl v. Commissioner, 67 T.C. 286 (1976).

Winter got the bonus payment in early 2002 and was free to use it as he saw fit.  That he might have had to repay some of the money later on does not relieve him from paying tax on the bonus in the year he received it.

## III. Charitable Contribution

An S corporation can make charitable contributions, but it doesn't deduct them when calculating its income.  See sec. 301.6245-1T(a)(1)(ii), Temp. Proced. & Admin. Regs., 52 Fed. Reg. 3003 (Jan. 30, 1987).  Instead, it notifies its shareholders of their pro-rata shares so each may deduct his portion on his individual return subject to each shareholder's individual limits on charitable giving.  See, e.g., sec. 170(b).

On the K-1 that it sent to Winter, BFC listed $5,062 as his share of its charitable contributions.  Winter did not claim this deduction on his return, and the Commissioner questioned in his pretrial brief whether Winter should now be able to.  Because Winter didn't address this issue after submission of the case, we treat him as having conceded it.  See Rule 151(e)(4) and (5); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Money v. Commissioner, 89 T.C. 46, 48 (1987).

## IV. Accuracy-Related Penalty

The last issue is whether Winter is liable for a penalty. The Commissioner isn't exactly clear about which misbehavior he wants to penalize and why.  Section 6662(b) lists triggers for the accuracy-related penalty, two of which may be at issue here--

a negligence penalty (section 6662(b)(1)) and a substantial-understatement-of-income-tax penalty (section 6662(b)(2)).[13]  The notice of deficiency's "Explanation of Changes" refers only to substantial understatement of income tax, defined under section 6662(d), with no mention of negligence.  The Commissioner's pretrial brief argued for a negligence or a substantial-understatement penalty.  The parties stipulated before trial that the only remaining penalty at issue was for negligence.  But the Commissioner's posttrial brief again asserts both grounds.  (Winter was at least consistently vague throughout and stuck to combating all "section 6662(a)" penalties.)

We also have to decipher the underpayments to which these penalties might apply.  The notice of deficiency shows that the Commissioner determined a penalty against the entire underpayment--whether attributable to Winter's misreported S-corporation income or to his unreported dividend, interest, and gambling income.  This seems simple enough.  But although Winter conceded some adjustments, he didn't concede the associated penalty.  And in bearing his burden of production the Commissioner focuses solely on the big money, without mention of the smaller items.

---

[13] Winter would not be liable for double penalties, but the Commissioner can argue in the alternative to get at least one to stick.  See sec. 1.6662-2(c), Income Tax Regs.

A. <u>Penalty Tied to Dividend, Interest, and Gambling Income</u>

Winter agreed that he failed to report miscellaneous income from dividends and gambling, and didn't fight the Commissioner's assertion about some interest income, but he did not concede the related penalties. That's enough to put them at issue, and trigger the Commissioner's burden under section 7491(c) of producing some evidence in support of the penalties. See <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001).

The Commissioner first asserted, in the notice of deficiency, only the substantial-understatement penalty. But he added to his claim in his pretrial memo by asserting in the alternative a negligence penalty. At this point, then, either penalty was on the table. See <u>Baker v. Commissioner</u>, T.C. Memo. 2008-247 (citing <u>Estate of Petschek v. Commissioner</u>, 81 T.C. 260, 271-72 (1983), affd. 738 F.2d 67 (2d Cir. 1984), and <u>Koufman v. Commissioner</u>, 69 T.C. 473, 475-76, (1977)). But the Commissioner then stipulated that the only penalty issue "remaining for the Court to decide [is] * * * [w]hether petitioners are liable for the negligence penalty imposed under section 6662(a)." This knocked the substantial-understatement penalty off the table. See <u>Money</u>, 89 T.C. at 48 (finding Commissioner conceded negligence penalty when not pursued on brief or in trial memorandum); <u>Koufman</u>, 69 T.C. at 475-76 ("It is well settled that the Court cannot approve a deficiency unless the Commissioner has

made a claim therefor"). The Commissioner's last-minute attempt to catch the substantial-understatement penalty and nudge it back on the table in his posttrial brief is just too late. Stipulations are binding and cannot be changed unless justice so requires, Rule 91(e), and the parties' stipulation of facts states that all stipulations shall be conclusive. We also note that the Commissioner hasn't even asked to be relieved of this stipulation, and we will therefore hold him to it.

The Commissioner is thus left with the burden of producing some evidence of negligence. And for this the Commissioner can't rest on a concession of the underlying substantive item. See Higbee, 116 T.C. at 446. Section 1.6662-3(b)(1), Income Tax Regs., tells us that "[n]egligence is strongly indicated where * * * a taxpayer fails to include on an income tax return an amount of income shown on an information return." So the Commissioner could start simply by showing that Winter's miscellaneous income was included on information returns sent to Winter and Winter didn't report it. See Alonim v. Commissioner, T.C. Memo. 2010-190. But the Commissioner failed to do even this--he didn't present *any* evidence or argument related to these little income items--choosing instead to focus only on the issue of Winter's failure to report his passthrough income from BFC. We therefore find that the Commissioner failed to meet his burden of production and has conceded the penalty as related to the unreported dividend, interest, and gambling income. See Rule

151(e)(4) and (5); <u>Petzoldt</u>, 92 T.C. at 683; <u>Money</u>, 89 T.C. at 48.

B. <u>Penalties Tied to Inconsistent Reporting</u>

Although we agree with Winter that BFC should have deducted the disputed portion of his bonus, a significant difference remains between BFC's and Winter's calculation of his passthrough income.  And the Commissioner did produce evidence of negligence for Winter's inconsistent reporting.  He points at copies of Winter's K-1 and asserts Winter was negligent because Winter didn't report that income or instead file a Form 8082, Notice of Inconsistent Treatment.  The Commissioner also says that if Winter didn't receive the K-1, he should have asked either BFC or the IRS for a copy.

Negligence is a failure to "make a reasonable attempt to comply" with the internal revenue laws or to "exercise ordinary and reasonable care in the preparation of a tax return."  Sec. 1.6662-3(b)(1), Income Tax Regs.  And, as we just said, negligence is "strongly indicated" where the taxpayer "fails to include on an income tax return an amount of income shown on an information return."  <u>Id.</u>  The Code also penalizes a taxpayer who carelessly, recklessly, or intentionally disregards rules or regulations.  Sec. 1.6662-3(b)(2), Income Tax Regs.  We find the Commissioner has met his burden of production here.

Winter can escape the penalty if he had reasonable cause for the underpayment and acted in good faith in preparing his return.

See sec. 6664(c). We decide whether a taxpayer had reasonable cause and good faith based on the facts and circumstances, and focus on the extent to which the taxpayer tried to figure out his proper tax liability. Sec. 1.6664-4(b)(1), Income Tax Regs. "[A]n honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge and education of the taxpayer" tends to show good faith. Id. Winter says he made a good-faith effort to estimate his income when he didn't receive a K-1 from BFC. He admits he should have filed a Form 8082, but he says he shouldn't be penalized for this little mistake.

The parties fight mostly over whether Winter received the Schedule K-1 from BFC, but we don't think that matters. Even if Winter didn't receive a K-1, he was well aware that he should have, and he failed to ask for a copy from either BFC or the IRS. We agree with the Commissioner that Winter's long career in the financial industry and education in finance should have taught him the potentially significant differences between income statements for regulatory filings and those for tax reporting. See Sunoco, Inc. & Subs. v. Commissioner, T.C. Memo. 2004-29 ("the objectives of financial and tax accounting are 'vastly different'"). Winter's admission that he should have filed a Form 8082 indicates that he himself was aware of the possibility that he was reporting inconsistently with BFC, yet he failed to follow the relevant statute or otherwise alert the Commissioner.

Winter points out that he didn't have professional help in preparing his taxes, but if hiring a paid preparer does not always help taxpayers trying to dodge a negligence penalty, see sec. 1.6664-4(b)(1), Income Tax Regs., failing to do so certainly doesn't. Winter's reliance on regulatory financial statements was not reasonable for someone with his knowledge, education, and experience. We therefore sustain the Commissioner's determination of an accuracy-related penalty in connection with Winter's inconsistently reported income, to the extent any difference remains after accounting for BFC's deduction of the disputed portion of his bonus. This will take some calculating, so

Decision will be entered

under Rule 155.